STATE OF NORTH CAROLINA v. ALLEN LORENZO GAINES, BRYAN CORNELIUS HARRIS, AL MUSTAFA COLEMAN

No. 147PA92

(Filed 1 October 1992)

1. **Criminal Law § 1305 (NCI4th) — capital or noncapital trial — purpose of pretrial hearing**

In any pretrial hearing in a first degree murder case to determine the capital or noncapital nature of the trial, the trial court must determine upon the record and facts before it, as submitted by the parties, whether there is sufficient

evidence to support the submission of an aggravating circumstance to the jury.

**Am Jur 2d, Criminal Law § 418.**

2. **Criminal Law § 1333 (NCI4th)— capital trial—aggravating circumstance—standard of proof**

In ruling on whether an aggravating circumstance set forth in N.C.G.S. § 15A-2000(e) should be submitted, the trial court must use the same standard applied in determining the appropriateness of a motion to dismiss at the end of the evidence.

**Am Jur 2d, Trial § 857 et seq.**

3. **Criminal Law § 1342 (NCI4th)— capital trial—aggravating circumstance—law officer—official duties**

In determining whether an off-duty police officer serving as a security guard for a private enterprise was performing "official duties" at the time he was killed within the meaning of N.C.G.S. § 15A-2000(e)(8), the trial court must examine the particular nature, extent and circumstances of the secondary employment, the way in which such employment is routinely regarded by the employer and employee, and the nature of the actions taken by the officer at the time in question.

**Am Jur 2d, Sheriffs, Police, and Constables § 46 et seq.**

4. **Criminal Law § 1342 (NCI4th)— off-duty police officer—motel security guard—ejection rather than arrest of defendants—official duties**

The election of a uniformed off-duty police officer employed as a motel security guard to eject defendants from the motel premises rather than to arrest them for trespassing cannot be considered a bar to finding that he was acting pursuant to his official duties as a law enforcement officer in addition to any duties he was performing for the motel. The act of making an arrest does not define the point at which a uniformed officer, either on or off duty, begins to act officially rather than acting merely for private purposes.

**Am Jur 2d, Sheriffs, Police, and Constables § 46 et seq.**

5. **Criminal Law § 1342 (NCI4th)— off-duty police officer— retention of official status**

   A police officer retains his official law enforcement officer status even while "off duty" unless it is clear from the nature of his activities that he is acting *solely* on behalf of a private entity, or is engaged in some frolic or private business of his own.

   **Am Jur 2d, Sheriffs, Police, and Constables § 46 et seq.**

6. **Criminal Law § 1342 (NCI4th)— capital trial—aggravating circumstance—murder of law officer—motel security guard— ejection of defendants from motel premises—official duties**

   The aggravating circumstance set forth in N.C.G.S. § 15A-2000(e)(8) relating to the murder of a law enforcement officer includes duly sworn law enforcement officers in uniform when they are performing off-duty, secondary law enforcement related duties when it is clear that such duties and the pay therefrom are incidental and supplemental to their primary duties of law enforcement on behalf of the general public. Therefore, a uniformed police officer employed as a motel security guard was engaged in his official duties when he ejected defendants from the motel premises where police department policy provided that officers engaged in secondary employment must enforce the law and not be bound by rules or restrictions of a private employer, and it is clear that the officer was at all times acting as a law enforcement officer under the full supervision and control of the municipal police department for the sole purpose of enforcing the law.

   **Am Jur 2d, Sheriffs, Police, and Constables § 46 et seq.**

7. **Criminal Law § 1342 (NCI4th)— capital trial—aggravating circumstance—murder of law officer—motel security guard— engaged in official duties—killed because of official duties**

   There was sufficient evidence for the jury to find that a uniformed off-duty police officer employed as a motel security guard "was engaged in the performance of his official duties" at the time he was killed where he had ejected defendants from the motel premises; defendants returned to the motel and one defendant, with a nylon stocking over his face, pointed a shotgun at the officer and shot him; and the officer was rising and drawing his weapon at the time he was killed. Furthermore, the jury could find that the officer was killed

STATE v. GAINES

[332 N.C. 461 (1992)]

"because of the exercise of his official duty" where the evidence tended to show that the sole purpose of defendants' second visit to the motel was to kill the officer because of his earlier law enforcement actions involving them.

**Am Jur 2d, Sheriffs, Police, and Constables § 46 et seq.**

ON writ of certiorari, pursuant to N.C.G.S. § 7A-32, to review the order of *Lewis (Robert D.), J.,* entered on 3 March 1992, in Superior Court, MECKLENBURG County, ordering that the defendants be tried non-capitally on first-degree murder charges. Heard in the Supreme Court 10 September 1992.

*Lacy H. Thornburg, Attorney General, by Joan Herre Byers and Robin Perkins Pendergraft, Special Deputy Attorneys General and John J. Aldridge, III, Assistant Attorney General,* for the State-appellant.

*Malcolm R. Hunter, Jr., Appellate Defender, by M. Gordon Widenhouse, Jr., Assistant Appellate Defender,* for defendant-appellee Gaines.

*Fred W. DeVore, III,* for defendant-appellee Coleman.

*Charles L. Morgan, Jr.,* for defendant-appellee Harris.

*The North Carolina Association of Police Attorneys, by Randle L. Jones and Richard Hattendorf, amicus curiae.*

LAKE, Justice.

The issue presented by this case has not been addressed by this Court and thus is one of first impression in North Carolina. At issue here is whether, in determining the capital or non-capital nature of first-degree murder trials, the aggravating circumstance as set forth in the capital punishment statutory law of this state, specifically N.C.G.S. § 15A-2000(e)(8), may be applicable to the murder of law enforcement officers who are at the time engaged in secondary, supplemental employment for a private enterprise.

Under this subsection of the statute, in order for the State to proceed to try the case capitally, the evidence for the State must be sufficiently substantial to permit a jury to find that the first-degree murder was "committed against a law-enforcement officer" (1) while he was "engaged in the performance of his official duties" or (2) "because of the exercise of his official duty." N.C.G.S.

§ 15A-2000(e)(8) (1988). We hold that the aggravating circumstance set forth in N.C.G.S. § 15A-2000(e)(8) may indeed be applicable to the murder of law enforcement officers who are at the time engaged in secondary employment in determining whether a first-degree murder case should be tried capitally.

For the purposes only of the pretrial hearing in this case and this appeal, the parties have stipulated to the facts. The defendants, Allen Lorenzo Gaines, Bryan Cornelius Harris and Al Mustafa Coleman, were each indicted on 2 December 1991 on one count of first-degree murder of Charlotte Police Officer Eugene Griffin. The State determined it would try the defendants capitally upon one aggravating circumstance, i.e., N.C.G.S. § 15A-2000(e)(8). On 4 February 1992, defendant Gaines filed a motion for pretrial determination of the applicability of the aggravating circumstance set forth in N.C.G.S. § 15A-2000(e)(8), and defendant Coleman filed a similar motion on 17 February 1992. These motions both specified that the State contends that only one aggravating circumstance is supported by the evidence, i.e., N.C.G.S. § 15A-2000(e)(8), and that the State intends to request that this aggravating circumstance be submitted to the jury at the sentencing phase for a possible sentence of death. These motions further stated that the defendants contend that the evidence to be presented by the State, whether at trial or at sentencing, is insufficient as a matter of law to call for the submission to the jury of the aggravating circumstance set forth in N.C.G.S. § 15A-2000(e)(8). Defendants assert that the evidence is insufficient because Officer Griffin was a privately employed security guard at the time of his death and was not shot "because of the exercise of his official duty."

On 19 February 1992, Judge Robert D. Lewis held a hearing pursuant to the procedure approved in *State v. Watson,* 310 N.C. 384, 312 S.E.2d 448 (1984) to determine whether the killing of Officer Griffin "was committed against a law-enforcement officer . . . while engaged in the performance of his official duties or because of the exercise of his official duty." N.C.G.S. § 15A-2000(e)(8). After review of the stipulated facts and other documents, the trial court held there was insufficient evidence to find that the killing of Officer Griffin occurred while he was engaged in the performance of his official duties, or because of the exercise of his official duties. Accordingly, the trial court ordered that each defendant be tried for non-capital first-degree murder since the State identified no other aggravating circumstance as set out in N.C.G.S. § 15A-2000(e)

as being present from the anticipated evidence in the case. On 13 April 1992, the State filed a petition for writ of certiorari which this Court granted on 24 June 1992.

I.

On 22 November 1991, Officer Eugene Griffin, a duly sworn law enforcement officer with the Charlotte Police Department, was working in a secondary employment capacity for the Red Roof Inn. In addition to his regular police officer pay, Officer Griffin was being paid in accordance with his law enforcement officer status by the Red Roof Inn to provide, as a law enforcement officer, security for the motel, its property and its occupants. He was engaged in this secondary employment during hours that were not his regularly scheduled "on-duty" or on-shift hours with the Charlotte Police Department. In accord with the Charlotte Police Department regulations regarding such secondary employment, Officer Griffin wore his Charlotte Police Department uniform, which included his department-issued service revolver, his badge of office and his portable hand-held radio. The Red Roof Inn is within the territorial limits and jurisdiction of the Charlotte Police Department.

The employment of Officer Griffin with the Red Roof Inn was approved and regulated by the Charlotte Police Department in accordance with its General Order No. 8. The order specifically governs and controls a sworn law enforcement officer's ability to accept and the manner in which he performs any secondary, supplemental employment. Officer Griffin, according to the stipulation of facts, was complying with the requirements of General Order No. 8 attached to said stipulation. This general order provides in particular that officers shall not work "off duty" in a police-related capacity for businesses that are not frequented by the general public. The general order further required that any officer so engaged be supervised by the Charlotte Police Department during his or her secondary employment by a full-time Coordinator "consistent with guidelines imposed by the department." Additionally, this general order specifically provided that "officers engaged in secondary employment conform to the same standard of conduct as applies to their on-duty activities. (This would specifically include the requirement that they enforce the law and not let themselves be bound by rules or restrictions a private employer may wish to enforce for his own purposes)."

## STATE v. GAINES

[332 N.C. 461 (1992)]

At approximately ten minutes past twelve midnight, on 22 November 1991, defendant Gaines, accompanied by defendants Harris and Coleman, drove a black Nissan 200SX into the parking lot of the Red Roof Inn and parked close to the door of the lobby which was then occupied by Officer Griffin and the motel night auditor. Music from the automobile radio was loud and could be heard from within the office of the motel. After parking, the defendants exited the vehicle and approached the stairwell by the front-lobby entrance. Officer Griffin went to investigate and approached the defendants who were there to see a person in Room 201 named Anthony "Buster" Williams. Defendant Coleman was partially up the stairway and the remaining two defendants were standing close by when Officer Griffin stopped them. He advised them in words to the effect that "there was not going to be a party here tonight" and further that only one of the three would be allowed to visit the occupant in Room 201. Defendant Gaines began arguing loudly with Officer Griffin about his not allowing all three of them to go to the room. With Officer Griffin's permission, defendant Coleman proceeded upstairs and attempted to see Williams who did not open his door. Defendant Gaines questioned and argued with Officer Griffin as to his authority to deny all three of them access to the room, and Officer Griffin replied that he was a police officer employed by the Red Roof Inn and that they were to do what he said. Defendant Gaines persisted in arguing with Officer Griffin, whereupon the officer grabbed him by his coat with both hands and said "you will listen to what I say and you will leave the property." Defendant Coleman then came back downstairs and after further words with Officer Griffin the defendants left the motel property in the black Nissan. As they drove past the lobby door and Officer Griffin, the defendants yelled obscenities and cranked their automobile radio to full volume.

After the car left, Officer Griffin returned to his seat in the lobby of the motel and resumed conversation with the motel's night auditor. The two discussed why the three young men were at the motel. In the meantime, defendant Gaines was angry and upset because the police officer had "yoked him up." He told one of his companions who inquired what had happened, "That's o.k., that's o.k. Watch." He drove the Nissan to a nearby house or apartment, went inside and returned with a long shotgun. When defendants Coleman and Harris asked what he intended to do with the shotgun which he placed in the back seat of the Nissan, defendant Gaines

replied he was going to kill the officer, using an obscenity to refer to him. Defendant Coleman then told defendant Gaines several times that he had better leave "that Cop" alone.

Approximately twenty minutes after their first encounter with Officer Griffin, the defendants returned to the Red Roof Inn and parked the Nissan in a lot behind the Inn. They exited the vehicle, and Gaines placed a nylon stocking over his face and headed alone toward the motel with the shotgun. Gaines approached and started into the lobby front doors, which were opened for fresh air. Officer Griffin was seated on a sofa directly in front of the opened doors. At the entrance, defendant Gaines fired the shotgun at Officer Griffin. The night auditor was standing behind the counter between two computers and observed Officer Griffin attempt to stand, facing the door with a look of horror on his face just as the shotgun spray hit him in the right side of his chest and knocked him back against the wall. Simultaneously, Officer Griffin attempted to draw his service revolver. After the shotgun blast, Officer Griffin grabbed his chest and moaned "I've been shot."

Officer Griffin immediately called police communications with his portable radio and asked for immediate assistance, giving his location. At approximately the same time, the night auditor dialed 911 emergency for assistance. Charlotte Police Officers were dispatched and upon arrival found Officer Griffin lying beside the desk bleeding from the chest wound but still conscious. He was able to provide the officers with the suspects' car license tag number and also information regarding their identity. He told the officers present that: "It was the same guys I had trouble with earlier." Officer Griffin was mortally wounded and later died at Carolina's Medical Center.

## II.

[1] In any pretrial hearing in a first-degree murder case to determine the capital or non-capital nature of the trial pursuant to the procedure approved in *Watson*, the trial court must determine upon the record and facts before it, as submitted by the parties, whether there is sufficient evidence to support a submission of an aggravating circumstance to the jury. In the instant case, the only aggravating circumstance contended as appropriate by the State is within subdivision (8) of N.C.G.S. § 15A-2000(e), which relates to the murder of a law enforcement officer. Thus, the essence of the question now before this Court is one of statutory construc-

tion and application of the facts before the trial court as reflected in the record. N.C.G.S. § 15A-2000(e)(8) in its entirety states:

> The capital felony was committed against a law-enforcement officer, employee of the Department of Correction, jailer, fireman, judge or justice, former judge or justice, prosecutor or former prosecutor, juror or former juror, or witness or former witness against the defendant, while engaged in the performance of his official duties or because of the exercise of his official duty.

We have held it to be a cardinal principle that in the construction of statutes courts should always seek to give effect to the legislative intent, which may be discerned by consideration of the *purpose* of the statute, "the evils it was designed to remedy, the effect of proposed interpretations of the statute, and the traditionally accepted rules of statutory construction." *State v. Tew*, 326 N.C. 732, 738, 392 S.E.2d 603, 607 (1990). It is, of course, a fundamental principle of criminal jurisprudence that courts shall interpret penal statutes narrowly. *State v. Glidden*, 317 N.C. 557, 346 S.E.2d 470 (1986); *State v. Jordan*, 227 N.C. 579, 42 S.E.2d 674 (1947). We have further held that when "it is doubtful whether a particular aggravating circumstance should be submitted, the doubt should be resolved in favor of defendant. When 'a person's life is at stake . . . the jury should not be instructed upon one of the [aggravating] statutory circumstances in a doubtful case.' " *State v. Oliver*, 302 N.C. 28, 61, 274 S.E.2d 183, 204 (1981) (*quoting State v. Goodman*, 298 N.C. 1, 30, 257 S.E.2d 569, 588 (1979)). However, it is also fundamental in statutory construction that a reviewing Court must give a statute its plain or ordinary meaning, and that strict construction of statutes requires only that their application be limited to their express terms, as those terms are naturally and ordinarily defined. *Turlington v. McLeod*, 323 N.C. 591, 374 S.E.2d 394 (1988).

[2] In ruling on whether or not an aggravating circumstance set forth in the statute should be submitted, the trial court must use the same standard applied in determining the appropriateness of a motion to dismiss at the end of the evidence. In *State v. Stanley*, 310 N.C. 332, 312 S.E.2d 393 (1984), this Court stated:

> The evidence is to be considered in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom;

contradictions and discrepancies are for the jury to resolve and do not warrant dismissal; and all of the evidence actually admitted, whether competent or incompetent, which is favorable to the State is to be considered . . . .

310 N.C. at 339, 312 S.E.2d at 397. *See also State v. Artis,* 325 N.C. 278, 384 S.E.2d 470 (1989), *sentence vacated in light of McKoy,* 494 U.S. 433, 108 L. Ed. 2d 369 (1990), *new sentencing ordered,* 329 N.C. 679, 406 S.E.2d 827 (1991).

We have previously held that when an "on-duty" or on-shift law enforcement officer in uniform is murdered during the performance of his employment, the evidence supports submission of the aggravating circumstance set out in N.C.G.S. § 15A-2000(e)(8). *State v. Allen,* 323 N.C. 208, 372 S.E.2d 855 (1988), *sentence reinstated,* 331 N.C. 746, 417 S.E.2d 227 (1992); *State v. McKoy,* 323 N.C. 1, 372 S.E.2d 12 (1988), *sentence vacated,* 494 U.S. 433, 108 L. Ed. 2d 369, *on remand,* 327 N.C. 31, 394 S.E.2d 426 (1990); *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Hutchins,* 303 N.C. 321, 279 S.E.2d 788 (1981). The critical distinction in the case *sub judice* is the murder of an officer while engaged in a secondary, supplemental job for a private enterprise. The essence of subdivision (8) of the statute requires that the State *first* produce evidence that the victim was "a law enforcement officer" and *second* the State must meet one or the other of a disjunctive, two-pronged test: (1) that the officer was murdered "while engaged in the performance of his official duties" or (2) "because of the exercise of his official duty." N.C.G.S. § 15A-2000(e)(8).

With regard to the first requirement of subdivision (8) of the statute, it is clear from the stipulation, record and briefs submitted that the evidence fully supports that Officer Griffin was a duly sworn law enforcement officer when he was killed. Thus, we will address the latter alternative phrases of the statute concerning whether the officer was "engaged in the performance of his official duties" *or* was killed "because of the exercise" thereof.

[3]   With respect to the first of these two phrases the trial court concluded, and the defendants here contend, the officer was not engaged in his official duties within the meaning of this statutory language because of his "off-duty" secondary employment. Defendants contend that the record shows Officer Griffin, in the course of his two confrontations with the defendants, was performing no "official duties" of law enforcement, but rather was acting solely

as a security officer for the Red Roof Inn. We disagree and hold that the determination of this circumstance requires in each case an examination of the particular nature, extent and circumstances of the secondary employment by a private enterprise, the way in which such employment is routinely regarded by the employer and employee, and the nature of the actions taken by the officer at the time in question.

[4] With regard to the question of whether the officer was engaged in the performance of his official duties when he was murdered, it appears the trial court ruled the officer was not so engaged because he elected to eject the defendants from the premises of the Red Roof Inn instead of making an arrest. We find this to be an unduly narrow and an unrealistically restrictive interpretation of the term "official duties" as it relates in actual practice to law enforcement officers. Such an interpretation would seem to require that a law enforcement officer be actively and aggressively focused upon a particular criminal suspect, as in the case of actually drawing or firing his weapon or engaging in hot pursuit, in order for his public service to fall within the realm of "official duties." We find this to be an inordinately strained and unnatural application of this term as it is normally used with respect to the official duties of all law enforcement officers, which includes such duties as investigative work (including stakeouts), crowd or traffic control, and routine patrol by automobile.

The power of arrest is unique to law enforcement officers. N.C.G.S. § 15A-404(a) (1988). However, for the reasons hereinabove set forth with respect to the primary and secondary duties of a duly sworn law enforcement officer whether serving on or off duty, the act of making an arrest does not define the point at which a uniformed officer, either on duty or off duty, begins to act officially, as opposed to acting merely for private purposes. We note that our statutory law, as well as public policy considerations and the usual training afforded law enforcement officers, dictates that the act of making an arrest is the last and not the first act of intervention on the part of an on-duty or off-duty law enforcement officer in undertaking to handle appropriately instances of disturbance of the public peace. The lowest level of intervention on the part of our police officers is virtually a universally accepted practice in this country in terms of preservation of our civil liberties. This policy is specifically codified in North Carolina's

juvenile code which requires the least restrictive course of action appropriate to handle the situation. N.C.G.S. § 7A-594 (1989).

With respect to Officer Griffin's first encounter with the defendants, when they refused to obey his instruction to leave the premises pursuant to his authority, particularly after he had identified himself as a police officer, they became trespassers. N.C.G.S. § 14-159.13 (Supp. 1991). Thus, we find that the election by Officer Griffin not to arrest the three defendants for trespassing cannot be considered a bar to finding he was acting pursuant to his official duties as a law enforcement officer in addition to any duties he was performing for Red Roof Inn.

In North Carolina, a municipal law enforcement officer acting within his territorial jurisdiction is considered a peace officer who possesses "all of the powers invested in law enforcement officers by statute or common law." N.C.G.S. § 160A-285 (1987). "A police officer when off duty is still an officer and a policeman having the authority, if not indeed the duty to exercise functions pertaining to his office in appropriate circumstances, without regard to departmental rules relating to hours." 18 McQuillion, *Municipal Corporations 3d*, § 53.80B at 348. At common law, a law enforcement officer had the duty to keep the peace at all times. *See* 1 William Blackstone, *Commentaries* \*356; Edward C. Fisher, *Laws of Arrest*, § 21 (1967); *Sawyer v. Humphreys*, 82 Md. App. 72, 570 A.2d 341, *judgment reversed*, 322 Md. 247, 587 A.2d 467 (1990).

[5]   With regard to our laws dealing with a law enforcement officer's duties as to arrest or search, there is no distinction between on-duty and off-duty status. *See* N.C.G.S. §§ 15A-247 and 15A-401 (1988). N.C.G.S. § 14-269 affirmatively permits off-duty police officers to carry concealed weapons. Further, our legislature has mandated that an officer employed by a private security firm to act *solely* as a security guard is prohibited from wearing his official police uniform. N.C.G.S. § 74C-21 (1989). These legislative expressions appear to unerringly point to the proposition that a police officer retains his official law enforcement officer status even while "off duty" unless it is clear from the nature of his activities that he is acting *solely* on behalf of a private entity, or is engaged in some frolic or private business of his own.

Precedent from other jurisdictions appears to support this view, both on the issue of the applicability of an aggravating circumstance such as the one now under review or upon the issue of assault

on an officer. In *State v. Berry*, 391 So.2d 406 (La. 1980), an off-duty sheriff's deputy in his official uniform working as a bank guard was killed during a bank robbery while he was drawing his weapon. The court held he was acting in a law enforcement capacity for the purpose of the aggravating circumstance for capital murder. In *Revene v. Charles County Commissioners*, 882 F.2d 870 (4th Cir. 1989), the court stated that the lack of outward indicia suggestive of state authority, i.e., being on duty, wearing a uniform, or driving a patrol car, did not alone determine whether a police officer was acting under color of state law. Rather, the nature of the act performed by the officer controls. *Id.* In *Revene*, an off-duty deputy sheriff driving his own vehicle began following an individual. He pulled into a driveway behind the individual when he reached his destination. After some type of altercation, the deputy got out of his car, drew a handgun and fired, killing the individual. The Fourth Circuit held that the deputy, although off duty and out of uniform, was acting under color of state law because the nature of his act involved official police action to enforce the law on a matter coming to his personal attention. *Id.*

The court in *Duncan v. State*, 163 Ga. App. 148, 294 S.E.2d 365 (1982), in particularly relevant language states:

> The practice of municipalities which allows law enforcement officers while off-duty and in uniform, to serve as peace-keepers in private establishments open to the public is in the public interest. The presence of uniform officers in places susceptible to breaches of the peace deters unlawful acts and conduct by patrons in those places. The public knows the uniform and the badge stand for the authority of the government. The public generally knows that law enforcement officers have the duty to serve and protect them at all times.

163 Ga. App. at 149, 294 S.E.2d at 366.

This language from the Georgia court is consistent with the opinion of this Court in *State v. McKoy*, 323 N.C. 1, 372 S.E.2d 12, wherein we stated:

> When in the performance of his duties, a law enforcement officer is the representative of the public and a symbol of the rule of law. The murder of a law enforcement officer ... in the truest sense strikes a blow at the entire public—the

body politic — and is a direct attack upon the rule of law which must prevail if our society as we know it is to survive.

323 N.C. at 46-47, 372 S.E.2d at 37 (*quoting State v. Hill*, 311 N.C. 465, 488, 319 S.E.2d 163, 177 (1984)).

In the instant case, looking directly at the nature and extent of the secondary employment here involved, we take particular note of the following language in General Order No. 8 of the Charlotte Police Department. This Order provides:

Officers shall not work off duty in a police related capacity for businesses not frequented by the general public.

The Department requires that officers engaged in secondary employment conform to the *same standard of conduct* as applies to their on duty activities. (This would specifically include the *requirement that they enforce the law and not let themselves be bound by rules or restrictions a private employer may wish to enforce for his own purposes*).

The Department shall insure that officers engaged in secondary employment are properly supervised and that supervisors are directly responsible to the Department. . . .

(Emphasis added.)

[6] The language of this general order, applying directly to the situation here involved, and a part of the record before the trial court, clearly demonstrates that in the instant case Officer Griffin was at all times, including specifically his "off duty" secondary employment, acting as a law enforcement officer under the full supervision and control of the Charlotte Police Department for the sole purpose of "enforcing the law." We thus hold that N.C.G.S. § 15A-2000(e)(8), appropriately includes duly sworn law enforcement officers in uniform when they are performing off-duty, secondary law enforcement related duties, when it is clear that such duties and the pay therefrom are incidental and supplemental to their primary duties of law enforcement on behalf of the general public.

The duty of a duly sworn law enforcement officer, independent of any secondary, incidental employment, is to act as a peace officer who possesses "all of the powers invested in law enforcement officers by statute or common law." N.C.G.S. § 160A-285 (1987). The fact that the law enforcement officer receives supplemental compensation from a private employer, along with his continuing salary

from public employment, is of no consequence. His or her primary duty is always to enforce the law and insure the safety of the public at large. Officer Griffin was hired by the Red Roof Inn primarily on the basis of his official, governmental status with all the advantages which this status would bring to any secondary employment, including particularly in the realm of security. His uniformed presence alone is a visible symbol of the rule of law. A uniformed law enforcement officer is expected under his duty to use the powers a private security guard does not possess, i.e., the power to enforce the law and to arrest where necessary. *See* N.C.G.S. §§ 15A-401 and 15A-404. He was placed in that position by the private business to deter crime and enforce our system of law especially in an area where it was needed. While he also served to benefit the Red Roof Inn, his ultimate or primary purpose was to keep the peace at all times without regard to his "off-duty" or "off-shift" status.

[7] With respect to the second encounter between the defendants and Officer Griffin, at the moment he was shot, we find there is sufficient evidence in the record to enable the State to carry its burden of proof that the officer was working as a law enforcement officer within the course and scope of his official duties. Officer Griffin was suddenly confronted with a common armed robbery scenario of a stocking-hooded male with a pointed firearm, and he was rising and drawing his weapon in response thereto. Further, it is a crime to conceal one's identity by mask or hood and then enter or come upon the premises or enclosure of another, particularly with a drawn weapon. N.C.G.S. § 14-12.9 (1983). While the State conceded at the pretrial hearing that it was not asserting that Officer Griffin was engaged in law enforcement duties when he was killed, this concession by the State cannot prevail if the evidence before the court does in fact support that aggravating circumstance. *State v. Case*, 330 N.C. 161, 410 S.E.2d 57 (1991).

We further find it relevant that pursuant to N.C.G.S. § 143-166.1, both on-duty and off-duty law enforcement officers are covered under our death benefits statute when they are killed during the performance of their official duty. In the civil component of this matter, the Industrial Commission ruled that for the purpose of civil benefits, Officer Griffin "came to his death as a result of an injury or accident arising out of and in the course of his official duties in his employment as a full-time law enforcement officer." Decision and Award, I.C. No. LH-0223, *In the Matter of: Hilda*

*M. Griffin, Widow.* While we certainly recognize that a decision of the Industrial Commission on compensation is not controlling on the issue before us, and further that there is a different standard of proof between civil and criminal actions, we find, for purposes of statutory construction, there is no rational basis to distinguish between the criminal and civil definition and usage of the essential and defining term and the issue involved in both of these actions, i.e., whether the term "official duties" includes enforcement activity of the type in which Officer Griffin was engaged when he was murdered. We therefore hold that there is sufficient evidence for a jury to find that Officer Griffin was engaged in the performance of his official duties at the time he was killed.

With respect to the second prong of this portion of the statute, whether Officer Griffin was killed "because of the exercise of his official duty," we conclude that there was substantial evidence before the court that the entire motivation for the killing of Officer Griffin was "because of" his actions as a police officer, so identified, during his first encounter with the defendants. Indeed, there can be no other reasonable interpretation of the dialogue between the defendants and their course of conduct during the ten to twenty minutes which expired between their first and second encounter with Officer Griffin than that the sole purpose of their second visit to the Red Roof Inn was to kill a "cop" because of his earlier law enforcement actions involving them. We therefore conclude that there is substantial evidence from which a jury could find that the killing of Officer Griffin was because of his earlier exercise of his official duties as a law enforcement officer.

All of the officials enumerated in, and whose official status aggravates a murder pursuant to N.C.G.S. § 15A-2000(e)(8), are visible symbols of the rule of law and civil authority. Of all those listed — justices, judges, prosecutors, jurors, witnesses, correctional officers, firemen and law enforcement officers — the most visible symbol of law and order through the rule of law are the law enforcement officers. It is self-evident that the intent of N.C.G.S. § 15A-2000(e)(8) is to recognize that the integrity and authority of the criminal justice system itself is attacked when a defendant murders a judge, prosecutor, law enforcement officer or other person integral to the system because of their role or duty within the system. A uniformed police officer is both a representative and the most visible symbol of the American system of criminal justice. The evidence is sufficient for a jury to find that Officer

Griffin was shot and killed because he was attempting to preserve the peace and because he wore a police uniform and badge and was the symbol of the rule of law.

Thus, with regard to the two-pronged, alternative test of whether Officer Griffin was at the time "engaged in the performance of his official duties" or was killed "because of the exercise of his official duty," we conclude there was sufficient evidence before the trial court to hold the State had carried its burden of showing both aspects of this test. We therefore hold that the State presented to the trial court sufficient evidence to establish all aspects of the requirements for presenting N.C.G.S. § 15A-2000(e)(8) to the jury for its consideration as an aggravating circumstance. Accordingly, the decision and the order of the trial court is reversed and this case is remanded to the trial court for entry of an order consistent with this opinion.

Reversed and remanded.