***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and arguments of the parties. The appealing parties have not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. At the time of the alleged injury by accident, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter.
3. All parties have been correctly designated and there is no question as to the misjoinder or nonjoinder of parties.
4. An employee-employer relationship existed on employee's date of injury, November 10, 2003.
5. The City of Rocky Mount was a self-insured employer. In addition, the parties stipulated into evidence a packet of documents which included medical records and reports, Industrial Commission forms, and employment records.
6. At the hearing, defendants were directed to submit a Form 22 wage chart within thirty days. No Form 22 was ever submitted.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who was forty-one years old at the time of the hearing before the Deputy Commissioner, began working for the Rocky Mount Police Department in June 1987 as a police officer. In November 2003 plaintiff was a corporal who worked as a crime scene evidence lab technician as well as in the automated finger print identification system. On occasion she would also fill in as an evidence technician. She usually worked in an office at the police station but she was subject to being called out to a crime scene at any time during her shift. As a sworn law enforcement officer, she wore a class "B" uniform, wore her weapon and her handcuffs on her duty belt and was available by radio contact or otherwise throughout her work shift, even on breaks and during lunch periods.
2. Plaintiff had a history of irritable bowel syndrome (IBS), which would give her chronic diarrhea. She was apparently treated for the condition by Dr. Leland in the summer of 2003 and he referred her to Dr. Drossman at UNC, who first examined her on September 3, 2003. Prior to that evaluation, plaintiff had been taking Imodium regularly as well as Dicyclomine, if necessary, to try to control the symptoms. Despite the medication, she was having to spend too much time in the restroom and her activities had been limited due to her need to have a restroom reasonably accessible.
3. At the September 3, 2003 appointment, Dr. Drossman prescribed Latronex for plaintiff to see if a change in medication would help her. He also referred her to other specialties for evaluation to see if there were rheumatological or dermatological issues, as well. On November 3, 2003 plaintiff returned to Dr. Drossman saying that the Latronex had given her some relief but that she had had an episode of severe abdominal pain which had interrupted her vacation the previous week and that she had stopped taking the new medication because she did not know whether it was related to the abdominal pain she had experienced. Consequently, Dr. Drossman prescribed a different mediation, Desipramine, and instructed her to take it at bedtime. He also wanted her to reduce the amount of Imodium and Dicyclomine she was taking.
4. As of the morning of November 10, 2003, which was a week later, plaintiff had not gotten the new prescription filled, but she decided to get the medication that day, in large part because she was having symptoms which indicated that her IBS would probably flare up that day. Consequently, at her scheduled lunchtime, she went through the standard sign-out procedures and drove her personal vehicle to run errands, including stopping at a CVS pharmacy in order to get the prescription filled. A co-worker accompanied her.
5. Plaintiff obtained her prescription and began driving back to the police station. While her vehicle was waiting at a stop light on Benvenue Road, a Jeep driven by Erin Troy Sutton (Sutton) struck the back of her truck. Plaintiff got out of the truck and began walking to the rear of the vehicle to see if it had been damaged. She made eye contact with Sutton in the process and could tell from his expression that he was going to flee. Consequently, she tapped the hood of his car in order to leave fingerprints, threw up her hand and yelled for him to stop, while at the same time she tried to get out of the way. Sutton accelerated forward, striking plaintiff, who rolled off the hood of his Jeep and landed two lanes away from her truck. She lost consciousness momentarily due to the impact but aroused in time to see that Sutton, who had backed his vehicle, was turning his steering wheel and accelerating towards her. The wheels of the passenger side of his car ran over her legs.
6. Following the hit-and-run incident, plaintiff hurt seemingly everywhere, particularly around her knees. Someone called an ambulance and the police, and she was transported to Nash General Hospital. X-rays revealed no fractures. She complained of pain in her right elbow and hand in addition to her knees and she had multiple bruises and abrasions. The emergency room physician prescribed medication for her, placed her left knee in an immobilizer and advised her to use crutches. The doctor also kept her out of work for the next week and instructed her to get follow-up medical care.
7. On November 13, 2003 plaintiff went to Dr. Rosenblum, an orthopedic surgeon who had treated her previously for carpal tunnel syndrome. She complained of pain in her right elbow and hand, her left shoulder, her chest, both knees and both feet. The worst symptoms were in her left knee, which also felt unstable. Dr. Rosenblum diagnosed her with a contusion and excoriation of the elbow, left shoulder impingement with a contusion, a contusion of the right knee, contusions to both feet, and contusion to the left knee with possible meniscal or ligament tears. He advised her to continue with the medications, crutches and knee immobilizer prescribed at the hospital and kept her out of work.
8. Plaintiff subsequently went to Dr. Adams on November 20, 2003 because of persistent headaches, occasional nausea and problems concentrating since the incident. Dr. Adams was of the impression that she had sustained a mild concussion and recommended that she take over-the-counter medication.
9. Dr. Rosenblum subsequently ordered an MRI of plaintiff's left knee which revealed a bone bruise of the lateral femoral condyle, but the cartilage and ligaments appeared to be intact. Consequently, the doctor continued to treat her conservatively with medication and physical therapy. By December 30, 2003 she was walking without a limp and her knee pain was significantly improved, but the knee sometimes gave the sensation that it was going to give way. Dr. Rosenblum released her to return to work effective January 2, 2004.
10. Earlier in December, plaintiff had gone to a chiropractor, Dr. Hammer, for symptoms of neck and low back pain and headaches. The neck and back pain had apparently become noticeable after she had stopped taking the stronger pain medication prescribed at the emergency room. Dr. Hammer provided chiropractic treatment until at least June 2, 2004. On December 30, 2003 he allowed her to return to work effective January 5, 2004 with restrictions of no lifting more than twenty pounds and no running.
11. Plaintiff returned to work on January 6, 2004 and worked at light-duty. She did not go out to do crime scene investigations because of the possibility of having to do heavy lifting, climbing or crawling. The doctor continued to restrict her to light work and Dr. Rosenblum subsequently concurred with his restrictions. Issues developed at work regarding the nature of her work restrictions and she began to feel as though her supervisor, who wanted her back to full duty, was harassing her about the situation. Consequently, on February 24, 2004 she went to Larry Simmons, a social worker who provided counseling services. The next day she also saw Dr. Adams and reported that, in addition to persistent problems with neck pain and headaches, she was crying easily, isolating herself, having trouble sleeping and having problems with concentration and short-term memory. Dr. Adams was of the impression that she was clinically depressed, so he prescribed an anti-depressant for her and encouraged her to follow-up with the counselor, which she did.
12. On February 27, 2004 plaintiff went to Dr. Rosenblum's office and saw the physician's assistant. She was still having persistent bilateral knee pain and pain in her neck which radiated to her shoulder. On examination, the physician's assistant found some paraspinal spasm. Since the chiropractic treatment was not helping at that point, he recommended physical therapy for her neck and also referred her to pain management for her knees.
13. At his referral, plaintiff then saw Dr. Roberts, an anesthesiologist and pain management doctor, on March 9, 2004. Dr. Roberts was concerned that she had reflex sympathetic dystrophy of the knee but considered the headaches, which he diagnosed as due to occipital neuralgia, to be her primary problem. Consequently, he administered occipital nerve blocks which gave her good relief for the next week. He also prescribed Neurontin for her knees. The medication also gave her some pain relief. Dr. Roberts continued to treat her up to the date of hearing. He kept her on light-duty work and she continued to perform her office work up to the date of hearing.
14. Plaintiff also continued to see Mr. Simmons for counseling, at least until July 29, 2004. She experienced persistent problems with anxiety and depression associated with the hit-and-run incident and her chronic pain.
15. Defendant has denied this claim since plaintiff was in her own vehicle running personal errands during an unpaid lunch period at the time of the incident giving rise to the claim. Plaintiff has argued that she was on-call during her shift, that she had her radio on and with her throughout the time she was gone in case she was called into service, and that the prescription she picked up would enable her to continue working that afternoon without having to spend so much time in the restroom so that her employer would benefit from her errand.
16. However, plaintiff was not at her workstation and was not engaged in any police activity when her vehicle was rear-ended. The motor vehicle accident occurred during her lunch period, when she was free to leave the police station and drive wherever she chose for lunch as long as she was in her personal vehicle. She was not paid for the lunch period, which was not considered to be a "break", a shorter rest period taken on site; nor was she paid mileage for use of her vehicle. Although she had her police radio on while she was gone, she had not been called into service during her lunch period but spent the time running personal errands.
17. On the morning in question, plaintiff already had a prescription medication for her IBS but it made her sleepy so she tried not to use it, but rather used Imodium as much as possible to control the symptoms. The efficacy of the new prescription which she had picked up that day was unknown at that point. Since she was not supposed to take until bedtime, it would not have helped her stay her at her desk longer that afternoon in any event. Consequently, there was no indirect benefit to her employer of her obtaining the prescription that day.
18. The motor vehicle accident which occurred on November 10, 2003 was due to a risk common to the traveling public and was not due to a hazard peculiar to a police officer. In any event, plaintiff was not injured as the result of the motor vehicle accident. Rather, she was injured as a result of the assault which occurred after the accident. The driver of the other car deliberately ran his vehicle into her and then over her legs. Witnesses to the event immediately identified plaintiff as a police officer when she got out of her truck. Her behavior also demonstrated that she was a law enforcement officer since she threw up her hand, ordered the other driver to stop and tapped her fingers on the hood of the other car in order to leave identifiable fingerprints. These actions were in accordance with her law enforcement training. Despite his self-serving statements to the contrary made later, Sutton would also have recognized that the driver of the vehicle he had struck was a law enforcement officer. Sutton was charged with driving while impaired, among other charges, on this occasion so he had more reason to fear a law enforcement officer than the fact that he had just rear-ended a vehicle. The fact that plaintiff was obviously a police officer probably caused him to react differently than if she had been dressed in civilian clothing.
19. As a uniformed police officer, plaintiff was placed at an increased risk of being assaulted under these circumstances. The hit-and-run assault was a natural result of a risk reasonably associated with being a police officer who was involved in a motor vehicle accident with a drunken driver where the drunken driver was at fault in the accident. The assault was unexpected on plaintiff's part and would have probably not occurred but for the fact that she was in uniform.
20. On November 10, 2003 plaintiff sustained an injury by accident arising out of and in the course of her employment. The fact that she was assaulted in a hit-and-run incident constituted an unusual occurrence which interrupted her regular work routine. The assault arose out of and in the course of her employment since she was in uniform, since she was still within her work shift, since she was on-call for service and since the assault reasonably resulted from her being readily identifiable as a law enforcement officer.
21. As a result of this injury by accident, plaintiff was unable to work in any capacity from November 11, 2003 through January 5, 2004. Defendant paid her sick leave benefits during that time, but plaintiff wanted her sick leave reinstated.
22. From January 5, 2004 through the date of hearing, plaintiff was only capable of performing light work but defendant provided desk work for her during that time which was suitable to her capacity.
23. The conditions for which plaintiff was treated by Dr. Rosenblum, Dr. Adams, Dr. Roberts, Dr. Hammer and Mr. Simmons were a proximate result of the injury by accident giving rise to this claim.
24. Plaintiff had not reached maximum medical improvement as of the date of hearing with respect to the injuries she sustained on November 10, 2003. She required further medical and psychological treatment, which would tend effect a cure and give her relief.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. If this claim had been for injuries sustained in the motor vehicle accident itself, it would not have been compensable since the accident would not have arisen out of plaintiff's employment. She was driving her personal vehicle away from her workstation running personal errands during an unpaid lunch period and the accident was due to risks common to the traveling public. Furthermore, there was no benefit that day to her employer resulting from her having run those errands. N.C. Gen. Stat. §97-2(6); Horne v. Sandhill Furniture Company, 246 N.C. 173 (1956); Davisv. Mecklenburg County, 214 N.C. 469 (1938).
2. However, plaintiff's injuries resulted from an assault reasonably related to her employment as a police officer and not from the motor vehicle accident which preceded the assault. An assault is compensable if it arises from a risk created by the employment. Jobs which have been held to subject an employee to a special risk of assault include police officers and others who keep the peace. 1 Larson's Workers' CompensationLaw § 8.01 (2000).
3. On November 10, 2003 plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6); 1 Larson's Workers'Compensation Law § 8.01 (2000); Culpepper v. Fairfield Sapphire Valley,93 N.C. 242 (1989), aff'd per curiam, 325 N.C. 702 (1989); State v.Gaines, 332 N.C. 461 (1992).
4. Plaintiff is entitled to compensation for eight weeks for the temporary total disability she sustained as a result of this injury by accident. Defendant is either entitled to a credit for the sick leave benefits paid to her during that period or plaintiff will have to reimburse the City for the sick leave she received during that time, except that no credit is allowed for the twenty-five percent attorney's fee approved for plaintiff's counsel since there would otherwise be no compensation from which to pay the attorney. N.C. Gen. Stat. §§ 97-29;97-42; Church v. Baxter Travenol Laboratories, Inc., 104 N.C. App. 411
(1991).
5. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident, including necessary future medical and psychological treatment. N.C. Gen. Stat. §§ 97-2(19);97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay compensation to plaintiff for temporary total disability for eight weeks subject either to a credit for sick leave benefits paid or subject to plaintiff reimbursing defendant for the sick leave benefits she received, except that no credit is allowed for the twenty-five percent attorney's fee approved for her attorney. Otherwise, this compensation has accrued and would otherwise be due in a lump sum.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident, including those arising from necessary future medical and psychological treatment.
3. An attorney's fee in the amount of twenty-five percent of the compensation awarded is approved for plaintiff's counsel. Defendants shall pay him the fee directly in disallowance of full credit for sick leave benefits paid to plaintiff during the time she was unable to work.
4. Defendants shall pay the costs.
This the 23rd day of August 2005.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER