IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-631

No. COA21-628

Filed 20 September 2022

Randolph County, No. 18-CRS-054459

STATE OF NORTH CAROLINA

v.

JACKIE ALAN PIERCE, Defendant.

Appeal by Defendant from judgment entered 22 April 2021 by Judge James P. Hill, Jr., in Randolph County Superior Court. Heard in the Court of Appeals 9 August 2022.

*Attorney General Joshua H. Stein, by Assistant Attorney General Kayla D. Britt, for the State.*

*Hynson Law, PLLC, by Warren D. Hynson, for Defendant-Appellant.*

INMAN, Judge.

Jackie Alan Pierce ("Defendant") appeals from a judgment entered after a jury found him guilty of attempting to cause serious harm to a law enforcement agency animal under N.C. Gen. Stat. § 14-163.1(b) (2021). On appeal, Defendant contends that the trial court erred in declining to instruct the jury on a lesser-included offense and plainly erred in failing to instruct the jury on self-defense and willfulness. After careful review, we hold that Defendant has failed to demonstrate error.

## I.  FACTUAL AND PROCEDURAL HISTORY

The record below discloses the following:

On 8 September 2018, the Archdale Police Department ("APD") received a call from the Randolph County Sheriff's Office requesting assistance with a person armed with a knife and handgun who was threatening self-harm.  APD routinely responded to such requests for assistance.  Upon arrival at the scene, several APD officers were met in the front yard by Defendant's brother, who informed them that Defendant was drunk, armed with a knife, and had locked himself inside his bedroom.  Responding officers knew Defendant from prior domestic disturbance calls from his family.

The APD officers entered the home and tried talking to Defendant through his bedroom door, as they had previously resolved a similar situation with Defendant peacefully.  Defendant refused to come out and told the officers that "law enforcement[] would have to kill him if [they] entered."  Defendant also threatened to hurt the officers if they tried to stop him.  Defendant continued to grow more aggressive in his statements to law enforcement despite their attempts to negotiate a peaceful resolution.

With their efforts at de-escalation falling short, the officers alerted Defendant that they would be sending in a police dog, Storm, to subdue him if he did not cooperate.  Police had Storm bark to let Defendant know that he would be utilized if

Defendant did not comply. Defendant refused and "said . . . that he would kill law enforcement or [they] would have to kill him, that he would kill the dog."

¶ 6        Storm's handler kicked in Defendant's bedroom door. Inside the room, Defendant held a knife in one hand and a makeshift spear—crafted from a knife attached to a level—in the other. Defendant thrust the spear toward Storm at least five times, and Storm's handler believed the action to be a threat to the dog's safety. Defendant then lowered the level to try and cut himself with the knife held in his other hand, and Storm's handler instructed the dog to bite Defendant. Defendant dropped the spear as Storm's handler released the dog. Defendant then raised the arm holding the knife in what the handler perceived as a potentially "threatening gesture." Storm bit Defendant in the elbow of that arm, causing him to drop the knife. Storm then released Defendant, and APD officers took Defendant into custody.

¶ 7        On 7 October 2019, a grand jury indicted Defendant for willfully attempting to cause serious harm to a law enforcement agency animal. At trial, the APD officers who responded to the call testified consistent with the above recitation of the facts. Defendant rested his case without presenting further evidence. At the charge conference, Defendant's counsel requested an instruction on the lesser-included offense of attempting to cause harm to a law enforcement agency animal; the trial court denied that request. Following instruction and deliberation, the jury found Defendant guilty of the charged offense on 21 April 2021. The trial court sentenced

Defendant to 6 to 17 months imprisonment, suspended upon 36 months supervised probation. Defendant gave notice of appeal in open court.

## II. ANALYSIS

¶ 8 Defendant offers three principal arguments, that the trial court: (1) erred in rejecting his special instruction on the lesser-included offense of attempting to harm a law enforcement agency animal; (2) plainly erred in failing to instruct the jury on self-defense; and (3) plainly erred in omitting willfulness in the jury instruction on the elements of the crime charged. We disagree.

### A. Standards of Review

¶ 9 Preserved challenges to jury instructions are reviewed *de novo*. *State v. Richardson*, 270 N.C. App. 149, 152, 838 S.E.2d 470, 473 (2020). In determining whether the requested instruction is warranted, we view the evidence in the light most favorable to the defendant. *State v. Debiase*, 211 N.C. App. 497, 504, 711 S.E.2d 436, 441 (2011). To prevail on appeal, the defendant must show that there is a "reasonable possibility" that the jury would have reached a different result had the requested instruction been given. *State v. Brewington*, 343 N.C. 448, 454, 471 S.E.2d 398, 402 (1996).

¶ 10 We review unpreserved challenges to jury instructions under the plain error standard when such error is adequately asserted in a defendant's brief. *State v. Foye*, 220 N.C. App. 37, 44, 725 S.E.2d 73, 79 (2012); *see also* N.C. R. App. P. 10(a)(4) (2022)

("In criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error."). "Under the plain error rule, defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result." *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993).

**B. The Requested Lesser-Included Instruction**

¶ 11        Defendant requested, and the trial court refused, a jury instruction on the lesser-included offense of attempting to harm a law enforcement agency animal under N.C. Gen. Stat. § 14-163.1(c) (2021).

¶ 12        The State concedes, and we agree, that attempting to cause harm to a law enforcement animal under Subsection 14-163.1(c) is a lesser-included offense of attempting to cause serious harm to a law enforcement animal under Subsection 14-163.1(b), as the latter "contains all of the essential elements of the [former]." *State v. Smith*, 267 N.C. App. 364, 369, 832 S.E.2d 921, 925 (2019).

¶ 13        The trial court errs in denying this requested instruction if, in the light most favorable to Defendant, "there is the presence, or absence, of any evidence in the record which might convince a rational trier of fact to convict the defendant of a less grievous offense." *State v. Thomas*, 325 N.C. 583, 594, 386 S.E.2d 555, 561 (1989)

(citation and quotation marks omitted). But "'[w]hen the State's evidence is positive as to each and every element of the crime charged and there is no conflicting evidence relating to any element of the charged crime,' an instruction on lesser included offenses is not required." *State v. Northington*, 230 N.C. App. 575, 578, 749 S.E.2d 925, 927 (2013) (quoting *State v. Harvey*, 281 N.C. 1, 13-14, 187 S.E.2d 706, 714 (1972)).

¶ 14        The sole distinction between the felony of attempting to cause serious harm to a law enforcement agency animal under Subsection 14-163.1(b) and misdemeanor attempting to cause harm to a law enforcement agency animal under Subsection 14-163.1(c) is the gravity of harm involved. The statute differentiates these offenses by defining serious harm as any harm that:

    a.  Creates a substantial risk of death.

    b.  Causes maiming or causes substantial loss or impairment of bodily function.

    c.  Causes acute pain of a duration that results in substantial suffering.

    d.  Requires retraining of the law enforcement agency animal or assistance animal.

    e.  Requires retirement of the law enforcement agency animal or assistance animal from performing duties.

N.C. Gen. Stat. § 14-163.1(a)(4) (2021).

¶ 15        Defendant argues that, because the evidence shows he wielded the makeshift spear in a defensive attempt to "keep the dog at bay" and not in a more aggressive posture, there was evidence from which a jury could find that he acted without attempting to cause serious harm within the above statutory definition. We are not persuaded by this argument.

¶ 16        That the evidence shows Defendant took a more defensive stance in his confrontation with Storm does not negate the other uncontested evidence showing Defendant intended Storm deadly harm. A person may act in self-defense lethally just as well as non-lethally. APD officers testified, and Defendant did not rebut, that Defendant repeatedly expressed an intent to harm and kill police and/or Storm if they entered his room. When that occurred, Defendant wielded a spear fashioned from a level and knife toward Storm in an action that caused Storm's handler to fear for the animal's safety; indeed, that Defendant modified a knife into a *more* dangerous weapon evinces an intent to cause greater harm, even if defensively. After Defendant dropped the spear and Storm was released, he held the other knife in a perceptibly "threatening gesture." Knives, so used with express intention to cause death, are deadly weapons capable of causing serious injury. *See State v. Batts*, 303 N.C. 155, 161, 277 S.E.2d 385, 389 (1981) (noting that "[a] knife can be found to be a deadly weapon if, under the circumstances of its use, it is an instrument which is likely to produce death or great bodily harm, having regard to the size and condition of the

parties and the manner in which the knife is used"); *State v. Walker*, 204 N.C. App. 431, 444, 694 S.E.2d 484, 493 (2010) (explaining that small or ordinary items may be deadly weapons if "wielded with the requisite evil intent and force").

¶ 17        Because Defendant's purportedly defensive actions do not negate or conflict with the evidence that he intended serious harm—through verbal threats of death and wielding a makeshift spear and knife against Storm—we hold the trial court did not err in denying his requested instruction on the lesser-included offense of misdemeanor attempted harm to a law enforcement animal. *See Northington*, 230 N.C. App. at 578, 749 S.E.2d at 927.

**C. The Self-Defense Instruction**

¶ 18        Defendant next argues that the trial court committed plain error in failing to give an instruction on self-defense. Though Defendant acknowledges that a self-defense instruction is unavailable when the defensive actions were taken against a law enforcement officer "lawfully acting in the performance of his or her official duties," N.C. Gen. Stat. § 14-51.3(b) (2021), he contends that the APD officers were not acting in furtherance of any official duties "[b]ecause it was not apparent what, if any, crime [Defendant] was committing by locking himself in his own bedroom with a knife at the time the police kicked in his door and commanded Storm to attack him." Again, we disagree.

¶ 19        APD officers testified at trial that they were responding to a call for assistance

from the Randolph County Sheriff's Office in connection with an armed man who was locked inside his home and threatening self-harm. The officers were authorized to enter the house by Defendant's family to try and prevent harm to their relative, and APD officers had previously responded to similar domestic incidents involving Defendant. The exigency of the situation was underlined by Defendant's threats to kill police and Storm, and the report of potential self-harm was proved *ex post facto* by his attempts to slice his arm with a knife when confronted by the dog.

¶ 20        Law enforcements' official duties extend beyond investigating crime. *See State v. Gaines*, 332 N.C. 461, 471, 421 S.E.2d 569, 574 (1992) ("[T]he official duties of law enforcement officers . . . include[] such duties as investigative work (including stakeouts), crowd or traffic control, and routine patrol by automobile."). Police routinely respond to calls for assistance from ordinary citizens to address domestic disturbances in a variety of contexts. *See, e.g., In re I.K.*, 377 N.C. 417, 2021-NCSC-60, ¶ 32 (recounting law enforcement's response to a domestic disturbance call in a child dependency case); see generally *State v. Madures*, 197 N.C. App. 682, 678 S.E.2d 361 (2009) (describing police's prior response to a 911 call reporting a domestic disturbance that gave rise to a conviction for communicating threats). Our Supreme Court has elsewhere cautioned us to avoid "an unduly narrow and unrealistically restrictive interpretation of the term 'official duties' as it relates in actual practice to law enforcement officers." *Gaines*, 332 N.C. at 471, 421 S.E.2d at 574 (emphasis

added). Defendant does not cite, and we cannot find, any North Carolina caselaw where a police response to a domestic disturbance or an emergency call involving threats of self-harm was deemed outside law enforcements' official duties.

Other areas of the law demonstrate that law enforcement officers are tasked with more than just solving crimes and that these other duties include responding to requests for help with exigent threats to members of the public. For example, the Supreme Court of the United States has recognized an "emergency aid exception" to the Fourth Amendment's warrant requirement,[1] which "does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises." *Michigan v. Fisher*, 558 U.S. 45, 47, 175 L. Ed. 2d 410, 413 (2009). The exception "requires only an objectively reasonable basis for believing that a person within the house is in need of immediate aid." *Id.* (cleaned up). Thus, police "responding to a report of a disturbance" and "encounter[ing] a tumultuous situation [at] the house" caused by an irate and outwardly violent inhabitant may enter the home to prevent him from "hurt[ing] himself in the course of his rage" or render him aid upon a reasonable belief that he "had hurt himself . . . and needed treatment that

---

[1] Outside of a brief reference to "constitutional considerations" in his reply brief, Defendant has never contested the constitutionality of any of the police actions taken in this case. Needless to say, a reply brief is not the place for new argument, let alone one of constitutional magnitude. *See, e.g., Animal Prot. Soc. v. State*, 95 N.C. App. 258, 269, 382 S.E.2d 801, 808 (1989) (declining to consider a newly-raised constitutional argument asserted in a reply brief).

in his rage he was unable to provide." *Id.* at 48-49, 175 L. E. 2d at 413-14.

¶ 22          This Court has also formally recognized the "community caretaking" functions of law enforcement in analyzing warrantless searches and seizures. *State v. Smathers*, 232 N.C. App. 120, 126, 753 S.E.2d 380, 384 (2014). The doctrine is premised on public policy "giv[ing] police officers the flexibility to help citizens in need or protect the public even if the prerequisite suspicion of criminal activity which would otherwise be necessary for a constitutional intrusion is nonexistent." *Id.* In describing this doctrine, we favorably quoted the following observation from West Virginia's highest court:

> The doctrine recognizes that, in our communities, law enforcement personnel are expected to engage in activities and interact with citizens in a number of ways beyond the investigation of criminal conduct. Such activities include a general safety and welfare role for police officers in helping citizens who may be in peril or who may otherwise be in need of some form of assistance.

*Id.* (quoting *Ullom v. Miller*, 705 S.E.2d 111, 120-23 (W.Va. 2010)). Of note, law enforcement officers are specially trusted with the custody of mentally ill persons believed to be a threat to self or others and thus subject to involuntary commitment examination and are explicitly authorized to assist those requiring immediate psychiatric hospitalization as dangerous to self. *See, e.g.,* N.C. Gen. Stat. § 122C-262(a) (2021) (providing under our involuntary commitment statutes, "[a]nyone, *including a law enforcement officer*, who has knowledge of an individual who is

subject to inpatient commitment [as mentally ill and dangerous] . . . and who requires immediate hospitalization *to prevent harm to self or others*, may transport the individual directly . . . for examination by a commitment examiner[.]" (emphasis added)).

¶ 23   In short, law enforcement's ordinary and lawful duties are not strictly limited to investigating crimes, and they can include responding to a request for emergency assistance with an armed person threatening self-harm. Defendant's plain error argument—premised entirely on the claim that "it was not apparent what, if any, crime [Defendant] was committing"—therefore fails.

**D. The Willfulness Instruction**

¶ 24   In his final argument, Defendant asserts that the trial court committed plain error in failing to include willfulness in its instruction on the elements of the crime charged. Notwithstanding the fact that the trial court followed the pattern jury instructions—a practice explicitly encouraged by our Supreme Court, *State v. Morgan*, 359 N.C. 131, 169, 604 S.E.2d 886, 909 (2004)—we hold that Defendant cannot show the requisite prejudice.

¶ 25   The evidence unequivocally shows that Defendant acted willfully, *i.e.*, "purposely and deliberately, indicating a purpose to do it without authority—careless whether he has the right or not—in violation of law." *In re Adoption of Hoose*, 243 N.C. 589, 594, 91 S.E.2d 555, 558 (1956) (citation and quotation marks omitted). He

verbally threatened to kill Storm numerous times, and he followed up on those threats by waiving a makeshift spear at the dog in a dangerous manner. He then wielded the knife toward Storm in a perceptibly threatening way. There is no indication from the record evidence that Defendant acted with any concern for the lawfulness of his own or the APD officers' actions. In light of this uncontradicted evidence, it is not probable that the jury would have reached a different result absent the alleged error, and Defendant cannot show plain error. *See Jordan*, 333 N.C. at 440, 426 S.E.2d at 697.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, we hold that Defendant has failed to demonstrate reversible error.

NO ERROR; NO PLAIN ERROR.

Judges TYSON and GORE concur.