STATE OF NORTH CAROLINA v. KEITH ANTIONE CARTER, Defendant

No. COA10-974

(Filed 21 June 2011)

### 1. Confessions and Incriminating Statements— denial of pretrial motion to suppress—not in custody

The trial court did not err in a second-degree murder case by denying defendant's pretrial motion to suppress the statement he made to detectives at the police station. Considering the totality of circumstances, defendant was not in custody at the time of his recorded statement to police.

### 2. Jury— Batson challenge—race-neutral reasons—failure to show purposeful discrimination

The trial court did not err in a second-degree murder case by excluding prospective African-American jurors from the jury. The trial court found the prosecutor made race-neutral explanations and defendant failed to show purposeful discrimination.

### 3. Homicide— second-degree murder—motion to dismiss— sufficiency of evidence—intentional use of deadly weapon

The trial court did not err by denying defendant's motion to dismiss the charge of second-degree murder. Evidence of defendant's intentional use of a deadly weapon, a semi-automatic handgun, that proximately caused death triggered a presumption that the killing was done with malice.

### 4. Sentencing— aggravating factors—committed against police officer

The trial court did not err in a second-degree murder case by submitting to the jury the aggravating factor under N.C.G.S. § 15A-1340.16(d)(6) that the offense was committed against a police officer engaged in the performance of his official duties. Sentencing factors that might lead to sentencing enhancement do not have to be alleged in the indictment.

Appeal by defendant from judgment entered 12 March 2010 by Judge William Z. Wood, Jr. in Forsyth County Superior Court. Heard in the Court of Appeals 22 March 2011.

**STATE v. CARTER**

[212 N.C. App. 516 (2011)]

*Attorney General Roy Cooper, by Assistant Attorney General Charles E. Reece, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Daniel R. Pollitt, for defendant-appellant.*

HUNTER, Robert C., Judge.

Defendant Keith Antione Carter appeals his second-degree murder conviction. After careful review, we find no error.

<u>Facts</u>

At trial, the State presented evidence tending to establish the following facts: Late in the evening of 22 February 2007 and into the early morning hours of 23 February 2007, several Forsyth County deputies were working off-duty as security at the Red Rooster night-club in Winston-Salem. Around 2:00 a.m., several fights broke out inside the nightclub. As the deputies and bouncers tried to stop the fights, someone threw a chair which hit several people, and the fighting escalated. The deputies then began using pepper spray to break up the groups of people fighting and to force them outside. As the crowd—consisting of roughly 400 to 500 people—moved outside, at least 30 separate fights broke out in the parking lot.

Defendant, who had gone to the Red Rooster to meet his friend Brandon Horne, was involved in one of the fights and was hit in the face, leaving "[a] big gash under his eye." When the deputies began using pepper spray, defendant and Mr. Horne went outside and began walking to defendant's car. When Mr. Horne pointed out that defendant's cut was "bleeding pretty bad," defendant looked at his cut in his car's rearview mirror and got upset. Defendant then reached under the driver's seat and pulled out a 9mm semi-automatic handgun. He walked around to the front passenger's side, retrieved the "clip" from the glove box, loaded the clip, and "rack[ed]" a round in the chamber. Yelling "Fuck it. Who wants some?," defendant fired several shots "towards the crowd" in the parking lot. After "spraying" the crowd, defendant quickly got into his car and drove off "really fast."

Sergeant Howard Plouff, who was one of at least four Winston-Salem police officers who had responded to the deputies' call for emergency assistance at the Red Rooster, was hit in the neck by one of the bullets from defendant's gun. The bullet entered Sgt. Plouff's body under his jaw, "cut[ting]" his carotid artery and his jugular vein,

"fractur[ing]" his spine, and "destroy[ing]" part of his spinal cord. Sgt. Plouff was rushed to the hospital, where he died from the injuries resulting from the gunshot wound.

In the course of investigating Sgt. Plouff's death, Detective Stan Nieves learned that defendant may have been at the Red Rooster on 22-23 February 2007. Detective Nieves contacted defendant on 27 February 2007 and defendant agreed to come down to the police station to be interviewed. Because defendant was having problems with his car, two detectives picked him up from his mother's residence and defendant voluntarily went with the detectives to the police station. After being interviewed for several hours, defendant gave a tape recorded statement in which he stated that he was angry after being injured in the fight inside the nightclub, and that he went outside to his car, got out his handgun, loaded it, and fired five or six times "straight up" into the air.

At the conclusion of the interview, defendant was arrested and charged with the first-degree murder of Sgt. Plouff. A superceding indictment was later issued, alleging, among others, the aggravating factor that the murder was committed against a law enforcement officer while the officer was engaged in the performance of his official duties. Defendant was also charged with one count of felony engaging in a riot while possessing a handgun and one count of misdemeanor engaging in a riot[1]. Prior to trial, defendant filed a motion to suppress his statement to the police on the basis that the statement was obtained in violation of his Fifth Amendment rights. After conducting a suppression hearing, the trial court denied defendant's motion. At the close of the State's evidence at trial, defendant moved to dismiss all charges against him. The trial court denied the motion. After electing not to present any evidence in his defense, defendant renewed his motion to dismiss. The trial court denied this motion as well.

The jury found defendant guilty of second-degree murder, felony engaging in a riot while in possession of a handgun, and misdemeanor engaging in a riot. The jury also found the aggravating circumstance that the murder was committed against a law enforcement officer while engaged in the performance of his official duties. The trial court sentenced defendant to a presumptive-range sentence of six to eight months imprisonment on the felony riot conviction, followed by an aggravated sentence of 196 to 245 months imprisonment on the

---

1. Neither the indictments nor the verdict sheets regarding these charges are included in the record on appeal.

second-degree murder charge. Defendant gave notice of appeal in open court.

## I. Motion to Suppress

**[1]** Defendant first contends that the trial court erred in denying his pre-trial motion to suppress the statement he made to detectives at the police station. Because, defendant argues, the statement was obtained as a result of a custodial interrogation conducted without his having been advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), the statement should have been suppressed. As defendant does not challenge any of the trial court's findings of fact on appeal, the only question for review is whether those findings support the court's conclusion of law that "[d]efendant was not in custody" at the time of his statements to the detectives. *In re J.D.B.*, 363 N.C. 664, 668, 686 S.E.2d 135, 137-38 (2009).

Pertinent here, the United States Supreme Court has emphasized that

> "[p]olice officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' "

*Oregon v. Mathiason*, 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719 (1977) (per curiam). Rather, the "definitive inquiry" in determining whether a person is "in custody" for *Miranda* purposes is whether, based on the totality of the circumstances, there was a "formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." *State v. Gaines*, 345 N.C. 647, 662, 483 S.E.2d 396, 405 (1997) (citing *Stansbury v. California*, 511 U.S. 318, 128 L. Ed. 2d 293 (1994) (per curiam)).

This determination involves "an objective test, based upon a reasonable person standard, and is 'to be applied on a case-by-case basis considering all the facts and circumstances.' " *State v. Hall*, 131 N.C. App. 427, 432, 508 S.E.2d 8, 12 (1998) (quoting *State v. Medlin*, 333 N.C. 280, 291, 426 S.E.2d 402, 407 (1993)), *aff'd per curiam*, 350 N.C. 303, 513 S.E.2d 561 (1999). While "no single factor controls the determination of whether an individual is 'in custody' for purposes of *Miranda*[,]" *State v. Garcia*, 358 N.C. 382, 397, 597 S.E.2d 724, 737

(2004), *cert. denied*, 543 U.S. 1156, 161 L. Ed. 2d 122 (2005), our appellate courts have "considered such factors as whether a suspect is told he or she is free to leave, whether the suspect is handcuffed, whether the suspect is in the presence of uniformed officers, and the nature of any security around the suspect," *State v. Waring*, —— N.C. ——, ——, 701 S.E.2d 615, 633 (2010) (internal citations omitted).

Here, at the conclusion of the suppression hearing, the trial court entered its order orally from the bench, finding that Detective Nieves went to defendant's mother's house around 3:00 p.m. on 27 February 2007, where he was told that defendant was not at home. Detective Nieves left a business card with defendant's sister and asked her to have defendant contact him. Around 4:15 p.m., defendant called Detective Nieves, who explained to defendant that the police were investigating the shooting at the Red Rooster nightclub and were "interviewing everybody who had been at the scene." When defendant told Detective Nieves that he had been at the nightclub on the night of 22-23 February 2007, Detective Nieves "asked [defendant] if he would come down to the police station to give a statement . . . ." Defendant told Detective Nieves that there was "something wrong" with his car and that he was unable to come down to the police station at that time. Detective Nieves offered to send someone to "pick [defendant] up at his house," and defendant agreed to being picked up.

Detective Nieves called Detectives Phillip Cox and B.G. Kirk and asked them to pick up defendant and bring him to the police station. When they arrived and knocked on the door, defendant came outside, talked briefly with Detectives Cox and Kirk, who were in plain clothes, and then went back inside unaccompanied to get his wallet and keys. Defendant was neither searched nor patted down before getting into the passenger seat of the detectives' unmarked Honda Accord. While driving to the police station, defendant was told that "he could leave at any time" and that "he was not under arrest." When they arrived at the station, they parked in the public parking lot in front of the station and entered the building through the public entrance rather than through the "secure entrance" in the back. While unlocking the door allowing access to the offices and interview rooms, Detective Kirk told defendant that "the door only locks from the outside, and if he wanted to leave he could get out the door, it didn't require unlocking . . . ." The detectives led defendant to an interview room where they again told him that he was not in custody and that he "could exit through th[e] door at any time."

After leaving defendant unattended for roughly five minutes, Detectives Nieves and Sean Flynn entered the interview room at approximately 4:40 p.m. They explained to defendant that they were investigating the shooting death of Sgt. Plouff; that he was "not under arrest" and that "he could leave at any time"; but that they wanted to ask him some questions about what happened on the night of 22-23 February 2007. As the interview began, defendant was offered something to drink, which he declined. Later during the interview, defendant again was offered something to eat or drink and was given two sandwiches, some potato chips, a soda, and a cupcake.

The interview, which was "conversational" in tone, lasted several hours. During the interview, defendant signed a form consenting to the search of his residence, but refused to give a DNA sample or submit to a polygraph test. At 7:51 p.m. on 27 February 2007, defendant gave a tape recorded statement to the detectives, in which he indicated that he was at the Red Rooster on 22-23 February 2007; that several fights broke out at the nightclub, during one of which he was knocked to the ground and kicked in the face; and, that after the fight was broken up, he went to his car in the club's parking lot, got his semi-automatic handgun out from under the driver's seat, retrieved the magazine from the glove box, loaded the gun, and fired five or six times "straight up" into the air. After giving this statement, defendant was formally arrested. Based on these findings, the trial court concluded that "[d]efendant was not in custody" at the time he gave his statement and denied his motion to suppress.

Considering the totality of the circumstances, defendant was not in custody at the time of his recorded statement to the police. Defendant rode with the detectives to the police station voluntarily, without being frisked or handcuffed. Defendant was told at least three times—once in the car, once while entering the police station, and once at the beginning of the interview—that he was not in custody and that he was free to leave at any time. Defendant was not restrained during the interview and, in fact, was left unattended in the unlocked interview room before the interview began. Nor was defendant coerced or threatened. To the contrary, defendant was repeatedly asked if he wanted anything to eat or drink and was given food and a soda when he asked for it. The trial court properly denied defendant's motion to suppress his statement. *See State v. Deese*, 136 N.C. App. 413, 417-18, 524 S.E.2d 381, 384-85 ("In this case, defendant was permitted to arrange the first interview at a time convenient to him; at his request, the officers provided transportation from his res-

idence to the courthouse and back. Defendant was told on both occasions that he was not under arrest, that he was free to leave at any time, and that he would be driven home upon request. He was not restrained in any manner; in fact, he was left alone in an open room during the first interview. He was neither coerced nor threatened. . . . Considering the totality of the circumstances, we agree with the trial court's conclusion that defendant was not in custody on either occasion when he made statements to law enforcement officers and we find no error in the denial of his motion to suppress those statements."), *appeal dismissed and disc. review denied,* 351 N.C. 476, 543 S.E.2d 499-500 (2000).

## II. *Batson* Challenge

[2] Defendant, an African-American male, contends that the State "wrongfully excluded" prospective African-American jurors from the jury in this case in violation of his constitutional right, under *Batson v. Kentucky,* 476 U.S. 79, 90 L. Ed. 2d 69 (1986), to a jury selected without regard to race. Jury selection began on 2 March 2010 with the clerk calling the first panel of 12 prospective jurors, which included Kesha Wisley and Pamela Turner, both African-American women. Although the jury selection regarding the first panel was not recorded, it appears from the record that defense counsel asked to be heard outside the presence of the jury. After the prospective jurors were escorted from the courtroom, defense counsel made a *Batson* challenge, noting that the State had accepted 11 Caucasian jurors but had used two peremptory challenges to strike Ms. Wisley and Ms. Turner. When the trial judge asked the prosecutor to explain his "decision" to excuse Ms. Wisley and Ms. Turner, the prosecutor responded that Ms. Wisley indicated that her sister was then-presently incarcerated and that she "d[id] not believe [that] her sister was treated fairly by law enforcement"; that she had "visited several friends in prison"; that she was "a person without . . . much experience in the community"; and, that her "poor eye contact" and low voice indicated that she had a "very low level of enthusiasm" as a potential juror. As for Ms. Turner, the prosecutor stated that he had peremptorily excused her because she "tearfully" explained that her son had been sentenced to 35 years in prison for attempted murder and that she "d[id] not believe he was treated fairly." In response, defense counsel noted that both women had indicated that "they could be fair and impartial in this particular case"; that among the Caucasian jurors accepted by the State, there were two who had criminal records, several who had had "run-ins" with the police, and

one juror (Mr. Rierson) whose father was incarcerated; and that two Caucasian jurors had indicated that they had been living in the area for a "limited" period of time.

After hearing these arguments, the trial judge found that the State had offered race-neutral explanations for excusing Ms. Wisley and Ms. Turner:

> I think in the case of Ms. Wisley the State stated a racially neutral reason, which is the fact that her sister is in prison, she's visited several friends in prison, and she did not believe her sister was treated fairly.
>
> As to Ms. Turner she has a son in prison for 35 years in the State of Maryland, he received a 35 year sentence in the State of Maryland for attempted murder. Ms. Turner was very emotional when she described that, and she did say that her son was not treated fairly . . . .

The judge also noted that Mr. Rierson had indicated that he was not "close" to his father and that he felt that his father had been treated fairly.

In *Batson*, 476 U.S. at 89, 90 L. Ed. 2d at 83, the United States Supreme Court explained that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." Our Supreme Court has construed *Batson* as "set[ting] out a three-part test for determining whether the state impermissibly excluded a juror on the basis of race": (1) "the defendant must make a prima facie showing that the state exercised a race-based peremptory challenge"; (2) "[i]f the defendant makes the requisite showing, the burden shifts to the state to offer a facially valid, race-neutral explanation for the peremptory challenge"; and (3) "the trial court must decide whether the defendant has proved purposeful discrimination." *State v. Taylor*, 362 N.C. 514, 527, 669 S.E.2d 239, 254 (2008), *cert. denied*, —— U.S. ——, 175 L. Ed. 2d 84 (2009).

To facilitate appellate review, "the trial court must make specific findings of fact at each stage of the *Batson* inquiry that it reaches." *State v. Cofield*, 129 N.C. App. 268, 275, 498 S.E.2d 823, 829 (1998). "The trial court's findings will be upheld on appeal unless they are clearly erroneous—that is, unless 'on the entire evidence [the reviewing court is] left with the definite and firm conviction that a mistake ha[s]

been committed.' " *Taylor*, 362 N.C. at 528, 669 S.E.2d at 254 (quoting *Hernandez v. New York*, 500 U.S. 352, 369, 114 L. Ed. 2d 395, 412 (1991)) (first alteration added). Under this standard, "the fact finder's choice between two permissible views of the evidence cannot be considered clearly erroneous." *State v. Headen*, —— N.C. App. ——, ——, 697 S.E.2d 407, 412 (citation and quotation marks omitted), *disc. review denied*, —— N.C. ——, 704 S.E.2d 275 (2010).

Where, as here,

> the trial court requires the prosecutor to give his [or her] reasons without ruling on the question of a prima facie showing, the question of whether the defendant has made a prima facie showing becomes moot, and it becomes the responsibility of the trial court to make appropriate findings on whether the stated reasons are a credible, nondiscriminatory basis for the challenges or simply pretext.

*State v. Williams*, 343 N.C. 345, 359, 471 S.E.2d 379, 386 (1996). In such a case, "the appellate court considers the prosecutor's explanations pursuant to step two of *Batson*, and then proceeds to step three, inquiring whether the trial court was correct in its ultimate determination that the State's use of peremptory challenges did not constitute intentional discrimination." *State v. Mays*, 154 N.C. App. 572, 575, 573 S.E.2d 202, 205 (2002).

To rebut a prima facie showing of discrimination, "the prosecution must 'articulate legitimate reasons which are clear and reasonably specific and related to the particular case to be tried which give a neutral explanation for challenging jurors of the cognizable group.' " *State v. Cummings*, 346 N.C. 291, 308-09, 488 S.E.2d 550, 560-61 (1997) (quoting *State v. Jackson*, 322 N.C. 251, 254, 368 S.E.2d 838, 840 (1988), *cert. denied*, 490 U.S. 1110, 104 L. Ed. 2d 1027 (1989)). The prosecutor's explanations, however, "need not 'rise to the level justifying a challenge for cause,' and need not be 'persuasive, or even plausible.' " *Cofield*, 129 N.C. App. at 277, 498 S.E.2d at 830 (quoting *State v. Barnes*, 345 N.C. 184, 209, 481 S.E.2d 44, 57 (1997)). Indeed, "[s]o long as the motive does not appear to be racial discrimination, the prosecutor may exercise peremptory challenges on the basis of 'legitimate hunches and past experience.' " *State v. Porter*, 326 N.C. 489, 498, 391 S.E.2d 144, 151 (1990) (quoting *State v. Antwine*, 743 S.W.2d 51, 65 (Mo. 1987)). "The issue at this stage is mere 'facial validity,' and 'absent a discriminatory intent, which is inherent in the reason, the explanation given will be deemed race-neutral.' " *Headen*, ——

N.C. App. at ——, 697 S.E.2d at 413 (quoting *State v. McClain*, 169 N.C. App. 657, 668, 610 S.E.2d 783, 791 (2005)).

In this case, the prosecutor's explanation with respect to Ms. Wisley and Ms. Turner included the fact that both women had a close family member who was then-currently incarcerated and that both women felt that their relative had not been "treated fairly." This Court has held that "[t]he criminal conviction of a potential juror's relative has been recognized as a race-neutral reason for the exclusion of that juror by peremptory challenge." *McClain*, 169 N.C. App. at 669, 610 S.E.2d at 791. Consistent with *McClain*, we conclude that the trial judge's determination that the prosecutor's reason was race-neutral is not clearly erroneous.

Turning to *Batson's* third step, we consider whether the trial court's ultimate finding that "[t]he state did not exercise its peremptory challenges in a discriminatory manner" is clearly erroneous. At this stage, "the defendant may introduce evidence that the State's explanation is merely a pretext, and 'the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.' " *Headen*, —— N.C. App. at ——, 697 S.E.2d at 413 (quoting *Gaines*, 345 N.C. at 668, 483 S.E.2d at 408). It is at this step "that the persuasiveness of the justification becomes relevant . . . ." *Purkett v. Elem*, 514 U.S. 765, 768, 131 L. Ed. 2d 834, 839 (1995).

In attempting to show that the prosecutor's explanation was pretextual, the defendant may offer evidence "that the reasons presented 'pertained just as well to some white jurors who were not challenged and who did serve on the jury.' " *State v. McCord*, 158 N.C. App. 693, 696, 582 S.E.2d 33, 35 (2003) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 343, 154 L. Ed. 2d 931, 954 (2003)). In addition to disparate treatment, other factors that a defendant may rely upon to demonstrate pretext include:

> (1) the characteristic in question of the defendant, the victim and any key witnesses; (2) questions and comments made by the prosecutor during jury selection which tend to support or contradict an inference of discrimination based upon the characteristic in question; (3) the frequent exercise of peremptory challenges to prospective jurors with the characteristic in question that tends to establish a pattern, or the use of a disproportionate number of peremptory challenges against venire members with the characteristic in question; (4) whether the State exercised all of its

peremptory challenges; and, (5) the ultimate makeup of the jury in light of the characteristic in question.

*State v. Wiggins*, 159 N.C. App. 252, 263, 584 S.E.2d 303, 312 (2003).

Defendant first points to the fact that the State accepted Mr. Rierson, a Caucasian male juror, whose father had been incarcerated. Defendant also notes that "several other of the white jurors had connections with the criminal justice system"; that "[a]t least one of the white jurors kept in touch with people in prison"; and that "[t]wo of the white jurors had limited contact with the community," having lived in the county for a short period of time. Defendant claims that this disparate treatment between African-American and Caucasian jurors "[i]lluminat[es]" the State's explanation as being a pretext. Our Supreme Court, however, has held that "alleged disparate treatment of prospective jurors" does not "necessarily" demonstrate discriminatory intent:

> Choosing jurors, more art than science, involves a complex weighing of factors. Rarely will a single factor control the decision-making process. Defendant's approach in this appeal involves finding a single factor among the several articulated by the prosecutor as to each challenged prospective juror and matching it to a passed juror who exhibited that same factor. This approach fails to address the factors as a totality which when considered together provide an image of a juror considered in the case undesirable by the State. . . . Merely because some of the observations regarding each stricken venireperson may have been equally valid as to other members of the venire who were not challenged does not require finding the reasons were pretextual. A characteristic deemed to be unfavorable in one prospective juror, and hence grounds for a peremptory challenge, may, in a second prospective juror, be outweighed by other, favorable characteristics.

*Porter*, 326 N.C. at 501, 391 S.E.2d at 152-53 (internal alterations, citations, and quotation marks omitted). With respect to Mr. Rierson in particular, as the trial judge observed, although Mr. Rierson's father had been incarcerated, he indicated that he was not close to his father and that he felt that his father had been treated fairly.

Defendant also emphasizes that the effect of the State's peremptory challenges "le[ft] [defendant] with an all-white jury . . . ." This Court has explained, however, that

the requirement under *Batson* is purposeful discrimination; disparate impact is not sufficient. In other words, a defendant must demonstrate that the State intentionally challenged the prospective juror based on his or her race. It is not enough that the effect of the challenge was to eliminate all or some African-American jurors.

*Headen,* —— N.C. App. at ——, 697 S.E.2d at 414 (internal citation omitted).

As for the other factors pertinent to establishing pretext, defendant fails to present any argument that this case was susceptible to racial discrimination; that the prosecutor revealed any racial animus through his questions or comments during jury selection; or that the prosecutor used peremptory challenges to excuse African-American jurors in a disproportionate fashion or in a manner suggesting a pattern of discrimination. In sum, we cannot conclude, based on the record and under the applicable standard of review, that the trial judge's findings as to the prosecutor's race-neutral explanation and defendant's failure to show purposeful discrimination are clearly erroneous. The trial judge, consequently, did not err in denying defendant's *Batson* motion.

### III. Motion to Dismiss

**[3]** Defendant's third argument on appeal is that the trial court erred in denying his motion to dismiss the second-degree murder charge for insufficient evidence. A defendant's motion to dismiss should be denied "[i]f there is substantial evidence—whether direct, circumstantial, or both—to support a finding that the offense charged has been committed and that the defendant committed it . . . ." *State v. Locklear,* 322 N.C. 349, 358, 368 S.E.2d 377, 383 (1988). "Substantial evidence" is that amount of relevant evidence that a "reasonable mind might accept as adequate to support a conclusion." *State v. Smith,* 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). When considering the issue of substantial evidence, the trial court must view all of the evidence presented "in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose,* 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994), *cert. denied,* 515 U.S. 1135, 132 L. Ed. 2d 818 (1995). Whether the evidence produced at trial constitutes substantial evidence is a question of law for the trial court, which the appellate court reviews de novo. *State v. Bagley,* 183 N.C. App. 514, 523, 644 S.E.2d 615, 621 (2007).

Defendant was convicted of second-degree murder, which is defined as "the unlawful killing of a human being with malice, but without premeditation and deliberation." *State v. Foust*, 258 N.C. 453, 458, 128 S.E.2d 889, 892 (1963); N.C. Gen. Stat. § 14-17 (2009). Although the intent to kill is not a necessary element of second-degree murder, "there must be an intentional act sufficient to show malice." *State v. Brewer*, 328 N.C. 515, 522, 402 S.E.2d 380, 385 (1991). Evidence of the intentional use of a deadly weapon—here, a semi-automatic handgun—that proximately causes death triggers a presumption that the killing was done with malice. *State v. Bullard*, 312 N.C. 129, 160, 322 S.E.2d 370, 388 (1984). This presumption is sufficient to withstand a motion to dismiss a second-degree murder charge for insufficient evidence. *State v. Taylor*, 155 N.C. App. 251, 266, 574 S.E.2d 58, 68 (2002). The issue of whether the evidence is sufficient to rebut the presumption of malice in a homicide with a deadly weapon is then a jury question. *Id.*

The evidence in this case, viewed in the light most favorable to the State, tends to show that defendant, after being kicked in the face in a fight inside the nightclub, went outside and looked at his injury in his car's rearview mirror. Defendant became angry, retrieved a 9mm semi-automatic pistol from under the driver's seat of his car, walked around to the passenger side of the car, got out a loaded magazine from the glove box, and loaded the gun. Exclaiming "Fuck it. Who wants some?," defendant began firing his gun "toward the crowd," discharging the weapon seven times. A bullet from defendant's gun hit Sgt. Plouff in the neck, resulting in his death.

The evidence of defendant's use of a firearm, resulting in Sgt. Plouff's death, is sufficient to support the trial court's submission of the second-degree murder charge to the jury. *See Pressley v. State*, 395 So.2d 1175, 1177 (Fla. App. Ct. 1981) ("Clearly, a person of ordinary judgment would know that firing a loaded gun toward a group of people is reasonably certain to kill or do serious bodily injury to another. [Defendant]'s acts also indicated an indifference to human life and demonstrated ill will. Even though a defendant has no intent to hit or kill anyone, firing a gun into a crowd of people constitutes second degree murder when a person is killed as a result."); *Commonwealth v. Santiago*, 425 Mass. 491, 498, 681 N.E.2d 1205, 1211 (1997) ("Repeatedly firing a weapon near a large crowd is wanton and reckless behavior that may supply an element of murder in the second degree . . . ."). Defendant's argument is overruled.

## IV. Aggravating Factor

**[4]** Defendant's final argument on appeal challenges the trial judge's submission of the aggravating factor set out in N.C. Gen. Stat. § 15A-1340.16(d)(6) (2009) ("subsection (d)(6)"):

> The offense was committed against or proximately caused serious injury to a *present or former law enforcement officer*, employee of the Department of Correction, jailer, fireman, emergency medical technician, ambulance attendant, social worker, justice or judge, clerk or assistant or deputy clerk of court, magistrate, prosecutor, juror, or witness against the defendant, *while engaged in the performance of that person's official duties or because of the exercise of that person's official duties.*

(Emphasis added.)

This Court, in construing subsection (d)(6)'s aggravating factor, has found "instructive" the Supreme Court's decisions addressing a "nearly identical" factor "for determining whether a defendant may or may not be tried capitally." *State v. Pope*, 122 N.C. App. 89, 92, 468 S.E.2d 552, 555 (1996). That statute provides that a defendant may be tried capitally when

> *[t]he capital felony was committed against a law-enforcement officer*, employee of the Department of Correction, jailer, fireman, judge or justice, former judge or justice, prosecutor or former prosecutor, juror or former juror, or witness or former witness against the defendant, *while engaged in the performance of his official duties or because of the exercise of his official duty.*

N.C. Gen. Stat. § 15A-2000(e)(8) (2009) (emphasis added) ("subsection (e)(8)").

In *State v. Gaines*, 332 N.C. 461, 421 S.E.2d 569 (1992), *cert. denied*, 507 U.S. 1038, 123 L. Ed. 2d 486 (1993), the Supreme Court explained that "[t]he essence of [subsection (e)(8)] requires that the State first produce evidence that the victim was 'a law enforcement officer' and second the State must meet one or the other of a disjunctive, two-pronged test: (1) that the officer was murdered 'while engaged in the performance of his official duties' or (2) 'because of the exercise of his official duty.' " *Id.* at 470, 421 S.E.2d at 573 (quoting N.C. Gen. Stat. § 15A-2000(e)(8)) (emphasis omitted). As subsection (d)(6) and subsection (e)(8) share similar phraseology, we believe subsection (d)(6) incorporates the same disjunctive framework,

requiring the State to establish that (1) the victim was a "law enforcement officer" and (2) the offense was committed against the officer (a) "while engaged in the performance of [his or her] official duties" or (b) "because of the exercise of [his or her] official duties." N.C. Gen. Stat. § 15A-1340.16(d)(6).

Here, by superceding indictment, the State alleged that "[t]he defendant committed the offense [of first-degree murder], including all lesser included offenses, against a law enforcement officer while the officer was engaged in the performance of his official duties as an officer with the Winston-Salem Police Department, in violation of NCGS § 1340.16(d)(6)." After the jury found defendant guilty of second-degree murder, the trial judge held a charge conference at which the prosecutor requested that the judge instruct the jury "alternative[ly]" on both prongs of subsection (d)(6). Defense counsel objected, arguing that there was insufficient evidence of either aggravating circumstance. The trial court overruled defense counsel's objection, and instructed the jury on both prongs:

> Having found the defendant guilty of second-degree murder, you must find—you must consider the following question: Do you find from the evidence beyond a reasonable doubt the existence of the following aggravating factor: "That the offense was committed against or approximately [sic] caused serious injury to a present or former law-enforcement officer while engaged in the performance of that person's official duties, or because of the exercise of that person's official duties."

As indicated by the verdict sheet, the jury found that defendant committed the offense "against or proximately caused serious injury to a present or former law enforcement officer, while engaged in the performance of that person's official duties or because of the exercise of that person's official duties."

Defendant first argues that the trial court erred in submitting to the jury subsection (d)(6)'s "because of" prong since the superceding indictment alleged only the "engaged in" prong. This argument was raised for the first time during oral argument before this Court. Despite not being raised at trial, defendant contends that the issue is properly before this Court for review because the absence of the aggravating factor being alleged in the indictment implicates the trial court's subject-matter jurisdiction to submit the factor to the jury for consideration. See generally State v. Webber, 190 N.C. App. 649, 650, 660 S.E.2d 621, 622 (2008) ("It is well-established that the issue of a

court's jurisdiction over a matter may be raised at any time, even for the first time on appeal or by a court *sua sponte*.").

With respect to N.C. Gen. Stat. § 15A-2000(e)'s aggravating circumstances, in *State v. Allen*, 360 N.C. 297, 317, 626 S.E.2d 271, 286 (2006), the Supreme Court "rejected" the capital defendant's argument that "the trial court lacked jurisdiction to enter a death sentence because the indictment did not list the aggravating circumstances to be proven by the State during the penalty phase." *Accord State v. Roache*, 358 N.C. 243, 267-68, 595 S.E.2d 381, 398 (2004) ("overrul[ing]" capital defendant's argument that indictment not alleging aggravating circumstances for which death penalty was imposed "deprived the trial court of jurisdiction"). This Court has similarly concluded that "sentencing factors that might lead to a sentencing enhancement do not have to be alleged in the indictment." *State v. Dierdorf*, 173 N.C. App. 753, 754, 620 S.E.2d 305, 306 (2005); accord *State v. Boyce*, 175 N.C. App. 663, 668-69, 625 S.E.2d 553, 557 (2006) ("[A]ggravating circumstances need not be specifically alleged in an indictment."). Thus, the absence of any allegation in the indictment that defendant committed the offense "because of" Sgt. Plouff's exercise of his official duties did not deprive the trial court of jurisdiction to submit this prong of the aggravating factor to the jury.

Alternatively, defendant contends that even if the trial court had "jurisdiction" to submit both prongs of subsection (d)(6), the evidence was insufficient to support their submission. In determining whether an aggravating factor should be submitted to the jury, "the trial court must use the same standard applied in determining the appropriateness of a motion to dismiss at the end of the evidence." *Gaines*, 332 N.C. at 469, 421 S.E.2d at 573. Succinctly stated, "[i]n determining the sufficiency of the evidence to submit an aggravating circumstance to the jury, the trial court must consider the evidence in the light most favorable to the State, with the State entitled to every reasonable inference to be drawn therefrom, and discrepancies and contradictions resolved in favor of the State." *State v. Syriani*, 333 N.C. 350, 392, 428 S.E.2d 118, 141 (1993).

Defendant first argues that the trial court erred in submitting the "engaged in" prong of subsection (d)(6) because the evidence was insufficient to show that defendant knew that Sgt. Plouff was a law enforcement officer engaged in the performance of his official duties at the time of the killing. Although subsection (d)(6) does not explicitly require a defendant's knowledge of the victim's protected status,

defendant claims that because the purpose of "aggravating factor[s] is to punish more severely those defendants who have acted with culpability beyond that necessary to commit the crimes of which they stand convicted," the State was required to prove that defendant "fired at Sgt. Plouff knowing that he was a law enforcement officer . . . ."

Neither the Supreme Court nor this Court has specifically addressed whether subsection (d)(6)'s "engaged in" prong requires proof that the defendant knew, or reasonably should have known, that the victim was a member of the protected class engaged in the performance of his or her official duties at the time of the offense. Nor has the Supreme Court concluded whether subsection (e)(8)'s "engaged in" prong includes a knowledge component. *See State v. Nicholson*, 355 N.C. 1, 47, 558 S.E.2d 109, 140 (2002) ("This Court has never addressed whether the trial court may submit the (e)(8) aggravating circumstance under the 'engaged in' prong in the absence of evidence tending to show the defendant knew or had reasonable grounds to know that the victim was a law enforcement officer.").

The Supreme Court has, however, explained that subsection (e)(8)'s two prongs focus on different aspects of the offense: "one prong is concerned with the *victim's conduct* at the time of the murder ('engaged in'), while the other prong is concerned with the *defendant's motive* ('because of')." *State v. Long*, 354 N.C. 534, 541, 557 S.E.2d 89, 94 (2001) (emphasis added). Because the "engaged in" prong focuses on the victim's conduct, the Supreme Court has described it as "address[ing] the *objective fact* that the victim was a law enforcement officer performing his official duties." *State v. Maness*, 363 N.C. 261, 290, 677 S.E.2d 796, 814 (2009) (emphasis added), *cert. denied*, —— U.S. ——, 176 L. Ed. 2d 568 (2010). In contradistinction, the "because of" prong has been construed as relating to the defendant's subjective intent, "purpose," or "motivation" for murdering the officer. *Gaines*, 332 N.C. at 476, 421 S.E.2d at 577; *accord Long*, 354 N.C. at 542, 557 S.E.2d at 94 ("To submit the 'because of' prong, the State must . . . show that defendant's motivation in killing the victim was that she was a [member of the class protected by subsection (e)(8)].").

Consistent with this objective-subjective distinction between subsection (e)(8)'s "engaged in" and "because of" prongs, as developed by the Supreme Court, we hold that subsection (d)(6)'s "engaged in" prong does not require the State to prove that the defendant knew or reasonably should have known that the victim was a member of the protected class engaged in the exercise of his or her

official duties. Submission of the aggravating factor simply requires evidence sufficient to establish the "objective fact" that the victim was a member of the protected class—here, a law enforcement officer—engaged in the performance of his or her official duties at the time of the offense. *Maness*, 363 N.C. at 290, 677 S.E.2d at 814.

This conclusion is further supported by considering subsection (d)(6)'s "engaged in" prong in context with the statute's other aggravating factors. N.C. Gen. Stat. § 15A-1340.16(d)(8), for example, provides that a sentence may be aggravated if, during the commission of the offense, "[t]he defendant *knowingly* created a great risk of death to more than one person by means of a weapon or device which would normally be hazardous to the lives of more than one person." (Emphasis added.) The General Assembly's inclusion of a knowledge requirement in N.C. Gen. Stat. § 15A-1340.16(d)(8) indicates that it purposefully omitted such a requirement from subsection (d)(6)'s "engaged in" prong. *See N.C. Dep't of Revenue v. Hudson*, 196 N.C. App. 765, 768, 675 S.E.2d 709, 711 (2009) ("When a legislative body 'includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that [the legislative body] acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting *Rodriguez v. United States*, 480 U.S. 522, 525, 94 L. Ed. 2d 533, 537 (1987))); *compare* Alaska Stat. § 12.55.155(e)(13) (2009) (establishing as aggravating circumstance fact that "the defendant *knowingly* directed the conduct constituting the offense at a[] . . .law enforcement officer . . . during or because of the exercise of official duties" (emphasis added)).

Other jurisdictions with aggravating factors similar to subsection (d)(6) have likewise concluded that such a factor does not contain a knowledge element. In *Unites States v. Wilson*, the federal district court held:

> The statutory aggravating factors enumerated by Congress include that "[t]he defendant committed the offense against . . . a Federal public servant who is . . . a law enforcement officer . . . while he or she is engaged in the performance of his or her official duties," regardless of whether the defendant knew or believed his victim[] was a law enforcement officer.

493 F. Supp.2d 491, 498 (E.D.N.Y. 2007) (quoting 18 U.S.C. § 3592(c)(14)(D)). Similarly, the Supreme Court of Georgia has construed Ga. Code Ann. § 17-10-30(b)(8), which provides that a defendant may be tried capitally if "[t]he offense of murder was committed

against any peace officer, corrections employee, or firefighter while engaged in the performance of his official duties," as "not requiring knowledge on the part of the defendant that the victim was a peace officer or other designated official engaged in the performance of his duties." *Fair v. State*, 284 Ga. 165, 170, 664 S.E.2d 227, 233 (2008). Although not controlling, *Morton Bldgs., Inc. v. Tolson*, 172 N.C. App. 119, 127, 615 S.E.2d 906, 912 (2005), we find these authorities persuasive and consistent with our construction of subsection (d)(6).

We note, moreover, that importing a knowledge requirement into subsection (d)(6)'s "engaged in" prong would have the untoward consequence of potentially precluding the submission of this aggravating factor when the offense was committed against a plainclothes or "undercover" officer. *See Fair*, 284 Ga. at 169, 664 S.E.2d at 232 (observing that imposing knowledge requirement "would wholly preclude . . . punishment for the murder of an 'agent acting under cover' " (quoting *United States v. Feola*, 420 U.S. 671, 684, 43 L. Ed. 2d 541, 553 (1975))). We do not believe that the Legislature intended such an unreasonable result. *See Comr. of Insurance v. Automobile Rate Office*, 294 N.C. 60, 68, 241 S.E.2d 324, 329 (1978) ("In construing statutes courts normally adopt an interpretation which will avoid absurd or bizarre consequences, the presumption being that the legislature acted in accordance with reason and common sense and did not intend untoward results.").

Here, the State presented uncontroverted evidence that Sgt. Plouff was a police officer with the Winston-Salem Police Department engaged in the performance of his official duties when he was shot and killed by defendant. This evidence is sufficient to enable a reasonable jury to conclude that defendant murdered Sgt. Plouff while "engaged in" the performance of his official duties. The trial court, therefore, properly submitted subsection (d)(6)'s "engaged in" prong to the jury to consider as an aggravating circumstance.

Defendant also argues that the evidence is insufficient to support submission of subsection (d)(6)'s second prong because there is no evidence that defendant shot and killed Sgt. Plouff "because of the exercise of [his] official duties." N.C. Gen. Stat. § 15A-1340.16(d)(6). We have already held, however, that the evidence with respect to subsection (d)(6)'s "engaged in" prong was sufficient to support submission of the aggravating factor to the jury. As subsection (d)(6)'s "engaged in" and "because of" prongs are "disjunctive," *Gaines*, 332 N.C. at 470, 421 S.E.2d at 573, we need not address whether the trial

**IN RE FORECLOSURE OF JOHNSON**

[212 N.C. App. 535 (2011)]

court erred in submitting the "because of" prong given the fact that defendant did not raise any issue with respect to jury unanimity at trial or on appeal. Consequently, we find no error.

No Error.

Judges STEPHENS and ERVIN concur.