HUNTER, JR., Robert N., Judge.
 

 *543
 
 Brian Michael McQueen ("Defendant") appeals following a jury verdict convicting him of first degree murder and robbery with a firearm. Following the verdicts, the trial court imposed a sentence of life without parole. On appeal, Defendant contends he is entitled to a new trial because the trial court clearly erred in denying his
 
 Batson
 
 challenges. We disagree and hold the trial court did not commit error.
 

 I. Factual and Procedural Background
 

 On 24 September 2009, a Lee County grand jury indicted Defendant, a Black male, on one count of first degree murder and one count of robbery with a dangerous weapon. On 30 November 2009, the case was declared a capital offense. At arraignment, Defendant pled not guilty. On 12 July 2012, defense counsel filed a pretrial motion entitled, "Motion to Prohibit District Attorney From Peremptorily Challenging Prospective Black Jurors." In it, Defendant requested the trial court "prohibit the District Attorney from exercising peremptory challenges as to potential black jurors, or in the alternative, to order that the District Attorney
 
 *544
 
 state reasons on the record for peremptory challenges of such jurors." The trial court denied Defendant's motion.
 

 The case was called for trial 5 May 2014. On the jury questionnaires, prospective jurors were asked to answer "yes" or "no" to the question, "Have you or a family member ever been charged with a crime?" Juror 2 answered "no," Juror 10 answered "yes," Juror 11 answered "no," and Juror 12 answered "yes."
 

 On the second day of jury selection, 13 May 2014, prospective Juror 2 was called alone into the jury box. Juror 2 is a seventy-year-old black male who serves as a pastor and works as a security officer. He described his "thoughts about the death penalty" as follows:
 

 Well, I don't agree with the death penalty because of the fact that ... my religion says, "Thou Shalt Not Kill," and I don't want to be responsible for taking somebody's life. So I don't agree with the death penalty under no circumstances. But now, as far as going to jail for life, I would agree to that, but not the death penalty.... I can't preach one thing and then turn around and do something else.
 

 Juror 2 elaborated, "I'm totally against the death penalty, but maybe in some cases I might would change my mind," such as a defendant who "chop[ped] [a person] into
 
 *900
 
 pieces and then maybe burn[ed] them." The State asked to strike Juror 2 for cause, which the trial court denied. The State exercised a peremptory challenge and struck Juror 2. On
 
 voir dire
 
 , defense counsel raised a
 
 Batson
 
 challenge and the trial court found "there is no
 
 prima facie
 
 case" and summoned the next prospective juror.
 

 Juror 10 was called to the jury box on 4 June 2014, the seventeenth day of jury selection. Juror 10 is a thirty-one-year-old black female who works as a line technician. On
 
 voir dire
 
 , the State asked her which crimes she or her family members were charged with. She did not state she was convicted of any crimes, though her records indicated she was convicted of three counts of driving without a license and charged with felony possession of cocaine and possession of drug paraphernalia. When asked about her thoughts about the death penalty, she stated, "no one has the right to take another person's life," because she believes in the Commandment, "Thou Shalt Not Kill."
 

 The State used a peremptory challenge to strike Juror 10 and defense counsel raised a
 
 Batson
 
 challenge. The trial court found Defendant did not establish a
 
 prima facie
 
 case but gave "the State an opportunity to
 
 *545
 
 state race-neutral reasons for the record." The State claimed it struck Juror 10 because of her thoughts regarding the death penalty, and because she failed to disclose her criminal history when the State questioned her. The trial court afforded defense counsel "an opportunity to provide surrebuttal and to show the reasons offered by the State were inadequate or pretextual." On surrebuttal, defense counsel stated religion was not a strong enough basis for a peremptory challenge and that the State did not ask Juror 10 about her criminal charges. The State responded by providing additional reasons for striking Juror 10: when asked whether she believed law enforcement treated her brother fairly, she responded, "I would hope so," with a "smirk" on her face; when asked whether her brother's situation would affect her ability to be fair and impartial to both sides in this case, she paused, looked away, and said, "I have no opinion about any of his situations, he did what he did." The trial court found Defendant did not make out a
 
 prima facie
 
 case for his
 
 Batson
 
 challenge and ordered Juror 10's criminal record to be included in the court file. The trial court stated:
 

 The Court finds that [the criminal] record certainly provides an additional basis for the State's exercise of a peremptory challenge. However, the Court also finds that the State's bases for the exercise of a peremptory challenge to this juror were adequate, race-neutral and nondiscriminatory and non-pretextual, even in the absence of any evidence of the [juror] having any criminal record herself.
 

 Juror 11 was called to the jury box on 9 June 2014, the twentieth day of jury selection. Juror 11 is a sixty-four-year-old black male who works for the North Carolina Department of Transportation. On
 
 voir dire
 
 , he stated his great-niece worked for a potential witness, Mr. Webb, Defendant's former attorney. Juror 11 stated he spoke with Mr. Webb on multiple occasions. Juror 11 also worked with Defendant's grandfather in the 1960s, whom he last saw twelve to fifteen years prior to trial. Although he did not indicate so on the jury questionnaire, Juror 11 was familiar with five names on the witness lists. The record shows Juror 11 pled guilty to four prior charges regarding worthless checks with restitution of $3,869.56 in one of those instances. When asked about the worthless check charges, Juror 11 stated, there were "two or three ... and the bank would call me, notify me, I [would] go put the money there or what have you." The record also shows Juror 11 was twice charged with driving while his license revoked, though he only referred to a seatbelt violation when the State asked him about previous traffic offenses on
 
 voir dire
 
 .
 

 *546
 
 The State used a peremptory challenge raised concern about Juror 11's truthfulness and criminal history, stating, "[I]f we cannot trust a juror to be honest with us about matters which are essentially public record, then I don't know that we could trust them in terms of them telling use about other matters which are not easily verifiable." Defense counsel raised a
 
 Batson
 
 challenge and alleged the State was disproportionately striking black jurors. In response, the State
 
 *901
 
 claimed it struck Juror 11 because of his criminal history, his truthfulness, he knew one of the State's witnesses and four of Defendant's witnesses, his great-niece currently worked for a potential witness, and he previously worked with Defendant's grandfather. The State reiterated, "It's a combination of things. It's a read you get from somebody." On surrebuttal, defense counsel stated there was a "double standard being applied" to black prospective jurors. The trial court denied Defendant's challenge and stated the following:
 

 The Court finds that the defendant-bear in mind the defendant's low hurdle for the defendant to get over, has stated a
 
 prima facie
 
 case with respect to a
 
 Batson
 
 challenge. However, the Court finds that the State has provided and acted upon race-neutral, non-discriminatory and non-pretextual reasons for exercising its peremptory challenge.... [I am] [g]etting a little bit concerned about the rate of challenges, so I just draw that to the attention of counsel. Certainly, as I've indicated, there was ample reason to challenge [Juror 11] and all of the previous jurors that have been struck by the State as well.
 

 Juror 12 was called to the jury box on 11 June 2014, the twenty-second day of jury selection. Juror 12 is a forty-nine-year-old white male who is unemployed and previously worked in construction. He did "computer work" for potential witness Mr. Webb in the past, and Mr. Webb previously represented his wife for a traffic violation. Juror 12 had two worthless check charges with restitution of $10.00 and $20.00 respectively, and was previously charged with assault by pointing a gun and driving without a license. Juror 12 answered directly to all questions regarding previous criminal charges.
 

 The State passed on Juror 12, prompting defense counsel to re-argue its
 
 Batson
 
 challenge regarding Juror 11. Defense counsel argued, "the State is now passing on a white juror when that juror ... appears to have the same issues that the State used to excuse African American jurors." The State responded and distinguished Jurors 11 and 12, and
 
 *547
 
 emphasized, "his answers regarding past involvement with the court system" were not the "sole reason for challenging [Juror 11]." The State contended Juror 12 had a previous business relationship Mr. Webb, whereas Juror 11's relative currently works for Mr. Webb, and Juror 11 has met with Mr. Webb "three to four times." Moreover, Juror 11's worthless check charges totaled to over $4,000.00 and Juror 12's only totaled to $30.00. Juror 11 did not acknowledge his prior charges and Juror 12 did so without additional questioning. On surrebuttal, defense counsel pointed out the similarities in Juror 11 and 12's criminal records and argued Juror 11 did not have a close relationship with his great-niece or Mr. Webb. The trial court denied defense counsel's
 
 Batson
 
 challenge again, and stated:
 

 The Court's prior rulings with respect to the
 
 Batson
 
 challenge to [Juror 11] are confirmed in all respects. The previous findings are confirmed. The defendant's ... renewed
 
 Batson
 
 challenge is denied. State has offered race-neutral reasons for challenging [Juror 11] peremptorily. Those reasons are non-discriminatory and are non-pretextual.
 

 At the conclusion of jury selection, four out of the fifteen chosen jurors (26.6%) were African American, ten (66.7%) were Caucasian, and one (6.7%) was White American Indian. At trial, after the close of the evidence, the jury that heard the case consisted of three African Americans, eight Caucasians, and one White American Indian. The alternate jurors consisted of one African American and two Caucasians. The record shows the parties questioned eighty-six prospective jurors on
 
 voir dire
 
 . Twenty-one (24.4%) of those prospective jurors identified themselves as African American, fifty-nine (68.6%) as White, one (1.17%) as Asian, one (1.17%) as Hispanic, one (1.17%) as Multiracial, one (1.17%) as Spanish, one (1.17%) as White American Indian, and one (1.17%) as White-Hispanic Mix.
 

 After opening statements, the State presented evidence of two eyewitnesses who identified Defendant, two expert witnesses, statements made by Defendant to police, and photos of the crime scene. The following is a summary of the evidence taken in the light most favorable to Defendant.
 

 *902
 
 In April 2009, Imad Asmar ("Asmar"), a Palestinian, purchased the Jackpot Mini Mart, a convenience store in Sanford, North Carolina. Asmar worked with his brother Ali Mustafa ("Mustafa"), and his son, Ahmad Imad Asmar ("A.J."). Defendant regularly visited the Jackpot Mini Mart.
 

 *548
 
 Around 9:00 p.m. on 17 August 2009, Asmar arrived at the Jackpot Mini Mart while A.J. and Mustafa were working. Asmar's wife and younger son waited in the car while Asmar went inside the store. Asmar told A.J. to take his wife and son something to drink. A.J. took drinks to the two in the parking lot and sat with them in the car. Mustafa came out of the store but returned when a customer arrived. The customer left and Defendant walked towards the store and flashed a peace sign with his hand towards A.J. A.J. recognized Defendant, who had visited the store earlier that day.
 

 Asmar and Mustafa talked at the front counter when Defendant entered the store. Immediately, Defendant walked towards the counter, pulled out a .38 caliber revolver, and shot at Asmar and Mustafa multiple times. Four bullets struck Asmar in the chest, left shoulder, and both arms. Defendant demanded cash and stated, "I need hundreds." Defendant shot Asmar again as Asmar walked towards the exit. Defendant shot Mustafa in the neck, and Mustafa gave Defendant all of the money in the cash register and his pockets. The entire exchange lasted thirty seconds. Defendant walked out of the store and flashed a peace sign at A.J. again before walking into the nearby woods.
 

 Thereafter, Mustafa rushed out of the store and called emergency medical services ("EMS"). Mustafa asked A.J. which direction Defendant fled, and Mustafa relayed Defendant's whereabouts to the 911 dispatcher. Sanford police officers and EMS personnel arrived minutes later. Paramedics took Asmar to the hospital where he later died. An autopsy revealed Asmar was shot four to five times.
 

 Lead investigator Detective Keith Rogers of the Sanford Police Department and Detective Eric Pate presented photo lineups to A.J. and Mustafa separately. Both A.J. and Mustafa identified Defendant as the robber.
 

 Five hours later, police arrested Defendant and took him to the police station. Detective Rogers interviewed Defendant and Defendant claimed he was not involved in the robbery. Later, Defendant stated he accompanied another person who shot the men. Ultimately, Defendant confessed and told police he decided to rob the store but the gun accidentally went off during the robbery when Asmar reached for it. Defendant told officers he got the gun from a man named "Cougar" to rob the store, and he and Cougar split the stolen money. Defendant told police he "didn't want to kill anybody."
 

 On 15 July 2014, the jury convicted Defendant of first degree murder and robbery with a firearm. The trial court imposed a sentence of life without parole. Defendant timely entered his notice of appeal.
 

 *549
 

 II. Standard of Review
 

 "The 'clear error' standard is a federal standard of review adopted by our courts for appellate review of the
 
 Batson
 
 inquiry."
 
 State v. James
 
 ,
 
 230 N.C.App. 346
 
 , 348,
 
 750 S.E.2d 851
 
 , 854 (2013) (citing
 
 State v. Cofield
 
 ,
 
 129 N.C.App. 268
 
 , 275 n.1,
 
 498 S.E.2d 823
 
 , 829 n. 1 (1998) ). "Since the trial judge's findings ... largely will turn on evaluation of credibility a reviewing court ordinarily should give those findings great deference."
 
 James
 
 ,
 
 230 N.C.App. at 348
 
 ,
 
 750 S.E.2d at 854
 
 (citations omitted). "The trial court's ultimate
 
 Batson
 
 decision will be upheld unless the appellate court is convinced that the trial court's determination is clearly erroneous."
 

 Id.
 

 (citation omitted).
 

 III. Analysis
 

 In a capital murder case, the defendant and State are each afforded fourteen peremptory challenges during jury selection. N.C. Gen. Stat. § 15A-1217(a). However, Article I, Section 26 of the Constitution of North Carolina and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution "prohibit race-based peremptory challenges during jury selection."
 
 James
 
 ,
 
 230 N.C.App. at 348
 
 ,
 
 750 S.E.2d at 854
 
 (citation omitted).
 

 *903
 
 In
 
 Batson v. Kentucky
 
 ,
 
 476 U.S. 79
 
 ,
 
 106 S.Ct. 1712
 
 ,
 
 90 L.Ed.2d 69
 
 (1986), the United States Supreme Court announced a three-part test for
 
 Batson
 
 objections. Our Supreme Court utilized this analysis in
 
 State v. Taylor
 
 ,
 
 362 N.C. 514
 
 ,
 
 669 S.E.2d 239
 
 (2008), and set out the following test:
 

 First, the defendant must make a prima facie showing that the state exercised a race-based peremptory challenge. If the defendant makes the requisite showing, the burden shifts to the state to offer a facially valid, race-neutral explanation for the peremptory challenge. Finally, the trial court must decide whether the defendant has proved purposeful discrimination.
 

 Id.
 
 at 527,
 
 669 S.E.2d at 254
 
 (citations omitted). Defendant challenges the first and third prongs of the
 
 Batson
 
 test. He contends the trial court clearly erred in finding he did not make a
 
 prima facie
 
 showing that the State exercised a race-based peremptory challenge to Jurors 2, 10, and 11.
 

 The burden of presenting a
 
 prima facie
 
 showing the State exercised a race-based peremptory challenge is a low hurdle for defendants.
 
 James
 
 ,
 
 230 N.C.App. at 349
 
 ,
 
 750 S.E.2d at 854
 
 . The defendant must show that he is a "member of a cognizable racial group and ... the [State]
 

 *550
 
 has used peremptory challenges to remove from the jury members of the defendant's race."
 
 State v. Jackson
 
 ,
 
 322 N.C. 251
 
 , 254,
 
 368 S.E.2d 838
 
 , 840 (1988). The showing only need be "sufficient to shift the burden to the State to articulate race-neutral reasons for its peremptory challenge."
 
 James
 
 ,
 
 230 N.C.App. at 349
 
 ,
 
 750 S.E.2d at 854
 
 (quoting
 
 State v. Hoffman
 
 ,
 
 348 N.C. 548
 
 , 553,
 
 500 S.E.2d 718
 
 , 722 (1998) ).
 

 When the State volunteers its reasons for striking a juror, or the trial court requires the State to give such reasons, prior to making a finding, "the question of whether the defendant has made a
 
 prima facie
 
 showing becomes moot, and it becomes the responsibility of the trial court to make appropriate findings on whether the stated reasons are credible, nondiscriminatory basis for the challenges or simply pretext."
 
 State v. Williams
 
 ,
 
 343 N.C. 345
 
 , 359,
 
 471 S.E.2d 379
 
 , 386 (1996).
 

 After the defendant's
 
 prima facie
 
 showing, the burden shifts to the State to give race-neutral reasons for its strike. Under this second prong, the State must articulate legitimate, clear, and specific reasons which provide a race-neutral explanation for exercising the challenge.
 
 Jackson
 
 ,
 
 322 N.C. at 254
 
 ,
 
 368 S.E.2d at 840
 
 . When analyzing these reasons, we "address the factors as a totality which when considered together provide an image of a juror considered in the case undesirable by the State."
 
 State v. Porter
 
 ,
 
 326 N.C. 489
 
 , 501,
 
 391 S.E.2d 144
 
 , 152-53 (1990). Our Supreme Court identified multiple race-neutral reasons a party may rely upon when exercising peremptory challenges: "[r]eservations of a juror concerning his or her ability to impose the death penalty;" a potential juror or relative of the juror's criminal history; reservations about whether law enforcement treated a family member fairly; a potential juror's familiarity with the defendant or defendant's family; excessive eye contact or failure to make appropriate eye contact; or other reasons which correspond to a valid for-cause challenge but do not rise to the level of for-cause excusal.
 
 See
 

 State v. Cummings
 
 ,
 
 346 N.C. 291
 
 , 310,
 
 488 S.E.2d 550
 
 , 561 (1997) ;
 
 Porter
 
 ,
 
 326 N.C. at 499
 
 ,
 
 391 S.E.2d at
 
 151 ;
 
 State v. Carter
 
 ,
 
 212 N.C.App. 516
 
 , 524,
 
 711 S.E.2d 515
 
 , 523 (2011) ;
 
 State v. Crummy
 
 ,
 
 107 N.C.App. 305
 
 , 322,
 
 420 S.E.2d 448
 
 , 457 (1992) ;
 
 Hernandez v. New York
 
 ,
 
 500 U.S. 352
 
 , 362-63,
 
 111 S.Ct. 1859
 
 ,
 
 114 L.Ed.2d 395
 
 (1991).
 

 Following the State's rebuttal, the defendant has a right of surrebuttal to show the State's race-neutral reasons are merely pretext.
 
 Porter
 
 ,
 
 326 N.C. at 497
 
 ,
 
 391 S.E.2d at 150
 
 . To determine whether the defendant makes such a showing, "the trial court should consider the totality of the circumstances, including counsel's credibility, and the context of the information elicited."
 
 State v. Cofield
 
 ,
 
 129 N.C.App. 268
 
 , 279,
 
 498 S.E.2d 823
 
 , 831 (1998) (citing
 
 *551
 

 State v. Barnes
 
 ,
 
 345 N.C. 184
 
 , 212,
 
 481 S.E.2d 44
 
 , 59 (1997) ;
 
 State v. Thomas
 
 ,
 
 329 N.C. 423
 
 , 432,
 
 407 S.E.2d 141
 
 , 148 (1991),
 
 cert. denied
 
 ,
 
 522 U.S. 824
 
 ,
 
 118 S.Ct. 84
 
 ,
 
 139 L.Ed.2d 41
 
 (1997) ).
 
 *904
 
 Our Supreme Court utilized the following factors to determine if a party engaged in purposeful discrimination:
 

 (1) the susceptibility of the particular case to racial discrimination; (2) whether similarly situated whites were accepted as jurors; (3) whether the [party at issue] used all of its peremptory challenges; (4) the race of the witnesses in the case; (5) whether the early pattern of strikes indicated a discriminatory intent; and (6) the ultimate racial makeup of the jury. In addition, [a]n examination of the actual explanations given by the [party at issue] for challenging black veniremen is a crucial part of testing defendant's
 
 Batson
 
 claim. It is satisfactory if these explanations have as their basis a "legitimate hunch" or "past experience" in the selection of juries.
 

 James
 
 ,
 
 230 N.C.App. at 351
 
 ,
 
 750 S.E.2d at
 
 856 (citing
 
 State v. Robinson
 
 ,
 
 336 N.C. 78
 
 , 93-94,
 
 443 S.E.2d 306
 
 , 312-13 (1994),
 
 cert. denied
 
 ,
 
 513 U.S. 1089
 
 ,
 
 115 S.Ct. 750
 
 ,
 
 130 L.Ed.2d 650
 
 (1995) ).
 

 Recently, the United States Supreme Court reversed the Georgia Supreme Court and found the prosecution engaged in purposeful discrimination in a murder case involving a Black male defendant and an elderly white female victim.
 
 See
 

 Foster v. Chatman
 
 , --- U.S. ----,
 
 136 S.Ct. 1737
 
 ,
 
 195 L.Ed.2d 1
 
 (2016). The jury venire list in
 
 Foster
 
 reveals the following: the State made a legend on the list indicating green highlighting "represents Blacks"; the State highlighted the names of Black prospective jurors; "[t]he letter 'B' also appeared next to each [B]lack prospective juror's name; the State wrote "B# 1," "B# 2," and "B# 3," next to the names of three black prospective jurors; the State made a list of "definite NO's," with six names, five of which were black jurors; the State made a note that reads, "Church of Christ ... NO. No Black Church."; and every jury questionnaire completed by a Black juror had the race circled.
 

 Id.
 

 , --- U.S. ----,
 
 136 S.Ct. at 1744
 
 . The State gave reasons for striking the jurors that did not involve race.
 

 Id.,
 

 --- U.S. ----,
 
 136 S.Ct. at 1751
 
 . At oral argument Justice Kagan asked, "Isn't this as clear a
 
 Batson
 
 violation as a court is ever going to see?" Relying upon the State's case file and jury notes, the Court held the State's strikes of Black perspective jurors was pretextual and reversed and remanded the case.
 

 Id.
 

 --- U.S. at ----,
 
 136 S.Ct. at 1753
 
 .
 

 *552
 
 When analyzing alleged disparate treatment of prospective jurors, we consider whether the jurors in question are in fact similarly situated.
 
 State v. Waring
 
 ,
 
 364 N.C. 443
 
 , 490-91,
 
 701 S.E.2d 615
 
 , 645 (2010). Our Supreme Court held:
 

 Merely because some of the observations regarding each stricken venireperson may have been equally valid as to other members of the venire who were not challenged does not require finding the reasons were pretextual. A characteristic deemed to be unfavorable in one prospec-tive juror, and hence grounds for a peremptory challenge, may, in a second prospective juror, be outweighed by other, favorable characteristics.
 

 Porter
 
 ,
 
 326 N.C. at 501-502
 
 ,
 
 391 S.E.2d at 153
 
 (quotations omitted). When there are additional factors that distinguish jurors who are excused from those who are not, and the defendant cannot make a showing of pretext, the defendant fails to meet his burden of proving purposeful discrimination.
 
 See
 

 State v. Jackson
 
 ,
 
 322 N.C. 251
 
 , 257,
 
 368 S.E.2d 838
 
 , 841 (1988).
 

 Here, the two victims and the eyewitness in this case are Palestinian and Defendant is black. The State exercised a peremptory strike against Juror 2, a black male, who was questioned immediately following a third prospective juror, who was also black and seated on the jury. When questioned about his thoughts concerning the death penalty, Juror 2 stated he would not agree with the death penalty under any circumstances, elaborating he was a pastor and agreeing with the death penalty would make him a hypocrite, and that he might hypothetically agree to the death penalty if a defendant chopped someone into pieces and burned them. Our Supreme Court held that "[r]eservations of a juror concerning his or her ability to impose the death penalty constitute a racially neutral basis for exercising a peremptory challenge."
 
 Cummings
 
 ,
 
 346 N.C. at 310
 
 ,
 
 488 S.E.2d at 561
 
 .
 

 *905
 
 The State exercised a peremptory strike against Juror 10, a black female. After Defendant raised a
 
 Batson
 
 challenge, the State explained their bases for the strike: Juror 10's thoughts about the death penalty; her failure to disclose past criminal charges; her reservations about whether law enforcement treated her brother fairly; and her lack of eye contact when asked whether her brother's prosecution would affect her ability to be fair and impartial to both sides of the case. Our courts held the aforementioned bases for exercising the peremptory challenge to be racially neutral.
 
 Id
 
 . ;
 
 Porter
 
 ,
 
 326 N.C. at 499
 
 ,
 
 391 S.E.2d at
 
 151 ;
 
 Crummy
 
 ,
 
 107 N.C.App. at 322
 
 ,
 
 420 S.E.2d at 457
 
 .
 

 *553
 
 The State exercised a peremptory strike against Juror 11, a black male. The State did not strike Juror 12, a white male. Jurors 11 and 12 were charged with writing worthless checks and driving while license revoked in the past, and both knew a potential witness, Mr. Webb. However, this "state of circumstances in itself does not necessarily lead to a conclusion that the reasons given by [the State] were pretextual."
 
 Cofield
 
 ,
 
 129 N.C.App. at 279
 
 ,
 
 498 S.E.2d at 831
 
 (citations omitted). As in
 
 Jackson
 
 , there are additional factors distinguish Jurors 11 and 12: Juror 12 responded directly to questions about his criminal charges and Juror 11 minimized his criminal history; Juror 11 avoided questions regarding his family member's criminal charges; and Juror 12 had a business relationship with Mr. Webb, whereas Juror 11 spoke with Mr. Webb on multiple occasions and his great-niece worked for Mr. Webb.
 
 322 N.C. at 257
 
 ,
 
 368 S.E.2d at 841
 
 .
 

 After reviewing the record, it is clear the trial court properly considered the totality of the circumstances, the credibility of the State, and the context of the peremptory strikes against Jurors 2, 10, and 11.
 
 Cofield
 
 ,
 
 129 N.C.App. at 279
 
 ,
 
 498 S.E.2d at 831
 
 (citations omitted). Therefore, in light of the record, we hold the trial court did not commit clear error in rejecting Defendant's
 
 Batson
 
 objections.
 

 IV. Conclusion
 

 For the foregoing reasons we hold the trial court did not commit error.
 

 NO ERROR.
 

 Judges McCULLOUGH and DIETZ concur.